## AUDREY MONTI ET AL. *v.* NAOMI E. WENKERT ET AL.
### (SC 18028)
### (SC 18029)

Rogers, C. J., and Norcott, Katz, Zarella and Schaller, Js.

Argued February 14—officially released May 27, 2008

*Frank H. Santoro*, for the appellants (defendant Mark J. Decker et al.).

*Carey B. Reilly*, with whom were *Cynthia C. Bott*, and, on the brief, *Christopher D. Bernard*, for the appellees (plaintiffs).

### Opinion

KATZ, J. The defendant Mark J. Decker, individually and doing business as Ellington Family Practice, appeals from the judgment of the trial court, rendered after a jury trial, against him for damages and prejudgment interest in favor of the plaintiffs, Audrey Monti and Robert Monti, coadministrators of the estate of their seventeen year old daughter, the decedent, Lisa Monti (Lisa), for negligent treatment of Lisa's respiratory illness. In his consolidated appeals to this court,[1]

---

[1] The plaintiffs initially filed the present action against Naomi E. Wenkert, Wenkert's medical practice group, the Institute of Living Medical Group, P.C., and Wenkert's employer, the Institute of Living (institute). Wenkert and her medical practice group then filed an apportionment complaint against Rockville General Hospital (hospital) and Mark J. Decker, individually and doing business as Ellington Family Practice. In response, the plaintiffs filed a complaint against those defendants. Prior to trial, the plaintiffs withdrew their claims against the hospital and the institute. Because Wenkert and the Institute of Living Medical Group, P.C., were treated as one entity at trial

the defendant contends that the trial court improperly denied his motion to set aside the verdict on the grounds that: (1) the jury had returned an impermissible compromise verdict; (2) the trial court improperly had sent the jury back to reconsider only the issue of noneconomic damages; (3) the nondisclosure of a settlement agreement reached during trial between the plaintiffs and the named defendant, Naomi E. Wenkert, and her medical practice group, the Institute of Living Medical Group, P.C., prejudiced the defendant and tainted the verdict; and (4) the plaintiffs failed to engage in a precomplaint inquiry to determine whether there was a good faith basis to bring a malpractice action, as required by General Statutes (Rev. to 1999) § 52-190a (a). The defendant also contends that the trial court improperly awarded prejudgment interest to the plaintiffs. We are not persuaded by the defendant's contentions, and, accordingly, we affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On or about November 8, 1996, Lisa went to the defendant's office complaining of an earache. A physician's assistant attended to her and prescribed an antibiotic. On November 14, Lisa returned to the office complaining of a headache, loss of appetite, ear pain, chills and body aches. She was told to rest, drink fluids and continue on the medication. On November 15, Lisa went to the emergency room at Rockville General Hos-

we refer to them collectively as Wenkert. Although Wenkert is listed as a party on this appeal, judgment was rendered in her favor, and she has not filed any briefs or an appearance in this court. We therefore refer to Decker, in his individual capacity and doing business as Ellington Family Practice, as the defendant.

The defendant first appealed the trial court's judgment to the Appellate Court and later appealed from the trial court's decision awarding prejudgment interest. The Appellate Court granted the defendant's request to consolidate the appeals, and we thereafter transferred the appeals to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

pital (hospital) complaining of a rash, fever, earache, headache and loss of appetite. The hospital staff told the plaintiffs that they believed that Lisa had suffered an adverse reaction to the antibiotic she had taken, and she was prescribed a different medication and went home. Lisa returned to the hospital on November 16 because her symptoms had worsened to include throat tightness, difficulty swallowing, and an increased respiratory rate. At that time, she was admitted to the hospital's intensive care unit. The defendant was Lisa's attending physician from the day after she was admitted to the hospital, November 17, 1996, until he discharged her from the hospital on November 20. During her time in the intensive care unit, Lisa had trouble sleeping and appeared restless and anxious. On the basis of statements made by physicians and nurses in the hospital, Audrey Monti was led to believe that some of Lisa's symptoms were not physiological, but, rather, were Lisa's psychological reaction to her fear of what was happening to her in the hospital. In one such statement, a nurse told Audrey Monti that Lisa was not trying to get better. When the defendant discharged Lisa, he indicated to the plaintiffs that there was nothing medically wrong with her.

Believing that Lisa was having a psychological reaction, on November 21, 1996, the day after Lisa's discharge from the hospital, Audrey Monti took her to see her regular psychiatrist, Wenkert, at the Institute of Living (institute). When Lisa arrived at Wenkert's office building, she collapsed just outside the door in "severe respiratory distress," but recovered shortly afterwards and began to breathe more normally. At that time, Lisa exhibited blueish, purple lips—a condition later determined to be cyanosis or an indication that an individual is not moving oxygen into their blood. Wenkert diagnosed Lisa as having a panic attack, conducted the scheduled counseling session with her, and prescribed

Ativan, a sedative used to treat anxiety. Lisa died later that evening at approximately 9:30 p.m. An autopsy determined that Lisa's death was the result of acute respiratory distress syndrome, which was caused by a viral infection that neither the defendant nor Wenkert had diagnosed. Additional facts will be set forth as necessary.

The record also reveals the following relevant procedural history. On or about October 20, 1998, the plaintiffs filed a two count complaint against Wenkert, the Institute of Living Medical Group, P.C., and the institute, accompanied by a certificate of good faith. Wenkert in turn filed an apportionment complaint, pursuant to General Statutes §§ 52-102b and 52-572h, against the hospital and the defendant, alleging that their negligence in failing to diagnose Lisa's condition had been the cause of her death. Wenkert's complaint did not include a certificate of good faith. On or about, May 18, 1999, the plaintiffs filed their own complaint against the defendant, alleging that he was negligent in his treatment of Lisa. This complaint also did not include a certificate of good faith.

Thereafter, the defendant filed a motion to strike the plaintiffs' complaint on the ground that they had failed to file a certificate of good faith evidencing the statutorily required precomplaint inquiry, which the trial court, *Teller, J.,* denied. Subsequently, the defendant filed a motion for summary judgment on the same ground. While that motion was pending, the plaintiffs made a motion to file an amended complaint against the defendant that did include a certificate of good faith, which the trial court, *Aurigemma, J.,* granted over the defendant's objection. On January 6, 2003, after a hearing, the trial court, *Peck, J.,* denied the defendant's motion for summary judgment on the ground that the plaintiffs' amended complaint included a certificate of good faith.

Prior to trial, the plaintiffs withdrew their claims against the institute and the hospital, leaving only

claims against Wenkert and the defendant. See footnote 1 of this opinion. Trial began on February 9, 2005. On or about March 18, 2005, after the plaintiffs had rested their case, Wenkert and the plaintiffs entered into a settlement agreement, wherein Wenkert remained in the case, but the plaintiffs were guaranteed certain minimum and maximum damages awards, depending on the jury's verdict. The agreement was not disclosed to the defendant.

At the close of evidence, the trial court instructed the jury as to liability and both economic and noneconomic damages, and sent it to deliberate. During its deliberations, the jury sent three notes to the court regarding its lack of unanimity as to one of the defendants, and the court instructed them each time to continue deliberations. The jury thereafter returned its initial verdict, finding in favor of Wenkert but against the defendant and awarding only economic damages. The trial court stated to the parties that, although the jury reasonably had found that the defendant had breached the standard of care and awarded economic damages, it unreasonably had failed to award noneconomic damages in light of the evidence, and the court intended to send the jury back to reconsider the issue of noneconomic damages. The defendant objected to the trial court's decision to charge the jury to reconsider only the issue of noneconomic damages. Additionally, the defendant moved for a mistrial claiming that the jury had reached an impermissible compromise verdict. The court denied the motion and, over the defendant's objection, instructed the jury to reconsider its award of zero noneconomic damages. The jury returned its final verdict, awarding the plaintiffs $750,000 in economic damages and $1 million in noneconomic damages against the defendant.

Thereafter, the defendant filed a motion to set aside the verdict against him on essentially four grounds, each of which the court rejected. The court first con-

cluded that the failure of the plaintiffs to include a certificate of good faith in their original complaint against the defendant was not a basis upon which to set aside the verdict because: (1) the circumstances did not evidence the lack of a good faith precomplaint inquiry; (2) the defendant had not requested that the court conduct a factual inquiry into the basis for good faith; and (3) in any event, there was no evidence that there was a lack of good faith and setting aside the verdict would not be an appropriate sanction for the lack of a good faith certificate. Second, the court concluded that, given the facts of the case, it properly had sent the jury back to reconsider the issue of noneconomic damages with appropriate instructions as to that issue. The court explained that "[t]here was substantial and uncontroverted evidence of antemortem pain and mental suffering and loss of enjoyment of life. Given these circumstances the court narrowed its instructions to reconsideration of noneconomic damages."

Third, with respect to the defendant's claim that the circumstances surrounding the jury's deliberations indicated that its first verdict reflected an impermissible compromise verdict, the trial court reasoned that a compromise verdict was not the only reasonable explanation under the circumstances for the jury's decision awarding no noneconomic damages. More specifically, the court reasoned that: its original instructions to consider noneconomic damages were permissive, not mandatory; the jury's last note had indicated that it may have been struggling with the amorphous nature of such damages; and the jury may have determined that it was unfair for damages based on Lisa's pain and suffering ultimately to go to the plaintiffs. The trial court also concluded, however, that any errors in the original verdict were remedied by the jury's reconsideration of the issue of noneconomic damages because the jury

ultimately rendered a verdict in harmony with the evidence presented at trial.

Finally, with regard to the plaintiffs' and Wenkert's nondisclosure of their agreement, the trial court concluded that the agreement was not an impermissible settlement agreement because it did not give Wenkert an incentive to increase the defendant's liability. The court also determined that the agreement had not clearly prejudiced the defendant because: Wenkert and the defendant had had an adversarial relationship from the beginning of the trial; the agreement had been entered into late in the trial (after discovery, jury selection, and the presentation of the plaintiff's case-in-chief); and neither Wenkert nor the plaintiffs significantly changed their trial strategy after they had entered into the agreement. The trial court thereafter rendered judgment in favor of the plaintiffs with respect to the claims against the defendant, and after a hearing, the trial court also awarded prejudgment interest. These consolidated appeals followed, wherein the defendant renews the claims that he raised in his motion to set aside the verdict and challenges the award of prejudgment interest. We reject each of these claims.

To the extent that most of the defendant's claims relate to the court's denial of his motion to set aside the verdict, we set forth the well settled standard of review for such claims. "The trial court possesses inherent power to set aside a jury verdict which, in the court's opinion, is against the law or the evidence. . . . [The trial court] should not set aside a verdict where it is apparent that there was some evidence upon which the jury might reasonably reach their conclusion, and should not refuse to set it aside where the manifest injustice of the verdict is so plain and palpable as clearly to denote that some mistake was made by the jury in the application of legal principles . . . . Ultimately, [t]he decision to set aside a verdict entails the exercise

of a broad legal discretion . . . that, in the absence of clear abuse, we shall not disturb."[2] (Internal quotation marks omitted.) *Jackson* v. *Water Pollution Control Authority*, 278 Conn. 692, 702, 900 A.2d 498 (2006); see also *Edmands* v. *CUNO, Inc.*, 277 Conn. 425, 452–53, 892 A.2d 938 (2006); *Howard* v. *MacDonald*, 270 Conn. 111, 126–27, 851 A.2d 1142 (2004).

I

The defendant first contends that the verdict should have been set aside because the trial court acted improperly in response to the jury's original verdict, awarding the plaintiffs economic damages, but no non-economic damages, by instructing the jury to reconsider noneconomic damages. Specifically, the defendant contends that the totality of circumstances indicated that the jury had reached an impermissible compromise verdict, which requires a new trial as to both damages and liability. By extension, the defendant contends that the trial court improperly invaded the province of the jury when it instructed the jury to reconsider only the issue of noneconomic damages, without permitting it to reconsider liability in order to remedy the compromise verdict. We are not persuaded by the defendant's contentions.

The following additional facts are relevant to the resolution of these claims. After the close of evidence,

---

[2] To the extent that the defendant contends that we treat his challenge to the decision not to set aside the verdict as "mixed questions of law and fact," we note that the abuse of discretion standard encompasses a determination of whether the court applied the correct law to the facts. See *ACMAT Corp.* v. *Greater New York Mutual Ins. Co.*, 282 Conn. 576, 582, 923 A.2d 697 (2007) ("Under the abuse of discretion standard of review, [w]e will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . [Thus, our] review of such rulings is limited to the questions of whether the trial court correctly applied the law and reasonably could have reached the conclusion that it did." [Internal quotation marks omitted.]); see also *State* v. *Campbell*, 225 Conn. 650, 654, 626 A.2d 287 (1993) (clear misconception of governing law is abuse of discretion).

the court instructed the jury as to liability and damages. In its instructions on damages, the court indicated to the jury that, inter alia, "in addition to economic damages, you must also—you may also consider noneconomic damages." It provided some instruction as to the nature of each type of damages, distributed special interrogatories and verdict forms, and sent them to deliberate. On the first day of deliberations, the jury sent a note to the court indicating that it had reached a decision as to one defendant but was deadlocked as to the other defendant.[3] The court did not deliver a formal "Chip Smith" charge,[4] but simply instructed the jury to make an effort to reach a unanimous verdict.[5] After several more days of deliberations, the jury sent another note inquiring as to whether it could render a verdict for one defendant but remain deadlocked as to the other. Again, the trial court did not deliver a formal Chip Smith charge. Rather, it responded that the jury could be deadlocked as to one defendant and not the

[3] During the course of its deliberations, the jury sent approximately ten notes to the judge. The majority of these notes were requests for clarification of instructions or requests for certain portions of testimony to be read back to it.

[4] "The purpose of the [Chip Smith] instruction is to prevent a hung jury by urging the jurors to attempt to reach agreement. It is a settled part of Connecticut jurisprudence . . . . D. Borden & L. Orland, 5 Connecticut Practice Series: Connecticut Criminal Jury Instructions (2d Ed. 1997) § 4.4, p. 245. Better than any other statement . . . it makes clear the necessity, on the one hand, of unanimity among the jurors in any verdict, and on the other hand the duty of careful consideration by each juror of the views and opinions of each of his fellow jurors . . . . *State* v. *Feliciano*, 256 Conn. 429, 439, 778 A.2d 812 (2001)." (Internal quotation marks omitted.) *State* v. *O'Neil*, 261 Conn. 49, 60, 801 A.2d 730 (2002).

[5] The court stated in relevant part: "I hope you will reflect a little bit about [the jury] process, and what the process means. And, I know I instructed you earlier, in my instructions, that you really do have to give proper regard to the opinions of everybody. We certainly don't want you to violate your conscience. . . . I don't know . . . who's on what side or what the issue is, and it's not important what it is. But, I think for anybody that might be in the minority you have to reflect a little bit about . . . where you stand and why your position may be a little bit different from the others. And, try to go back and see if you can, as best you can, reach a unanimous verdict."

other, and then sent the jury back to deliberate further.[6] One day later, the jury sent another note, stating that it had reached a partial verdict but was hopelessly dead-locked at five to one on one of the special interrogatories. The trial judge then delivered a formal Chip Smith charge and sent the jury back for deliberation. Later that day, the jury returned with a verdict for Wenkert and a plaintiffs' verdict against the defendant in the amount of $750,000 in economic damages and no noneconomic damages.

Following this verdict, the trial court excused the jury and discussed with the parties its intention to reject the jury's verdict as to the defendant because the award of zero noneconomic damages shocked the conscience of the court.[7] Thereafter, the trial court reinstructed the jury on some general principles, including the role of the judge and the jury, the requirement of unanimity and the specific issue of noneconomic damages. Over the defendant's objection on the ground that the jury must reconsider both liability and damages, the court then asked the jury to reconsider the issue of noneconomic damages only. Shortly after retiring for more deliberations, the jury submitted yet another note to the court stating: "[T]he jury is still very unclear regarding the range of noneconomic damages we should be considering that would be acceptable . . . . Currently there continues to be great disagreement as to what

---

[6] The trial court stated in relevant part: "[A]s to your question about whether or not you are permitted to render a verdict on one physician and be undecided or deadlocked on the other, the answer to that is, yes. But, it's obviously preferable that you reach a unanimous verdict . . . with respect to both defendants, as to the entire case. . . . I will now send you back to deliberate some more."

[7] The trial court stated: "[E]ven if you say, you know, you can make an argument about physical or mental suffering, certain[l]y there's no question that Lisa lost her life, and to have no damages for the loss of enjoyment of a life of a [seventeen] year old shocks the conscience of the court, I can't accept that verdict, and I won't."

we should consider." The court instructed the jury that there was no specific range of noneconomic damages that it should consider, but that it simply should do its best to come up with an award "that is fair, just, and reasonable."[8] The jury ultimately returned with a noneconomic damage award of $1 million, for a total verdict of $1,750,000, which the court accepted.

A

We first consider the defendant's contention that the trial court should have set aside the verdict because the jury reached a compromise verdict. "In this state it is required that jury verdicts be unanimous, requiring each juror to decide the case individually after impartial consideration of the evidence with the other jurors." (Internal quotation marks omitted.) *McNamee* v. *Woodbury Congregation of Jehovah's Witnesses*, 194 Conn. 645, 647, 484 A.2d 940 (1984). "Connecticut has long accepted the possibility of juror disagreement and the fact that mistrials are a natural consequence of the unanimity requirement." *State* v. *Sawyer*, 227 Conn. 566, 585, 630 A.2d 1064 (1993). A compromise verdict is a "verdict which is reached only by the surrender of conscientious convictions upon one material issue by some jurors in return for a relinquishment by others of their like settled opinion upon another issue and the

---

[8] The trial court responded to the jury's note by instructing it in relevant part: "[W]hat you should consider are those elements of damages . . . that are included in the charge. Physical pain and suffering, and loss of enjoyment of life. . . . [T]he fact that you came up with zero, under the facts . . . of this case . . . that under all the circumstances it was not reasonable for you, the jury, to conclude that there was zero noneconomic damages. That's what I was telling you. I wasn't suggesting to you, and I cannot suggest to you, that there is a particular range that you should consider. And it doesn't matter what's acceptable to the court . . . . [T]here's no precise mathematical formula, there's no fixed rule . . . you have to do your best to make a fair estimate taking into account your common observation and experience in applying your common sense to do your very best, to come up with an award that is fair, just, and reasonable."

result is one which does not command the approval of the whole panel," and, as such, is not permitted. *Murray v. Krenz*, 94 Conn. 503, 509, 109 A. 859 (1920).

Once a jury has rendered a verdict that it claims is unanimous, it has long been the rule in our courts to presume the regularity of the deliberation processes of the jury and to decline to inquire into those deliberative processes. See Practice Book § 16-34 ("Upon an inquiry into the validity of a verdict, no evidence shall be received to show the effect of any statement, conduct, event or condition upon the mind of a juror nor any evidence concerning mental processes by which the verdict was determined. . . . [A] juror's testimony or affidavit shall be received when it concerns any misconduct which by law permits a jury to be impeached."). Accordingly, we do not resort to "assumptions" and "conjecture" when analyzing the basis of a jury's verdict.[9] See *Rosenblatt v. Berman*, 143 Conn. 31, 37, 119 A.2d 118 (1955); see also *McNamee v. Woodbury Congregation of Jehovah's Witnesses*, 193 Conn. 15, 26, 475 A.2d 262 (*Healey, J.*, concurring) ("[a]s a general rule, a strong presumption of regularity attaches to every step of a civil proceeding, including jury deliberations, and the burden is on the party seeking a new trial to show affirmatively that irregularity exists" [internal quotation marks omitted]), on appeal after remand, 194 Conn. 645, 484 A.2d 940 (1984); *Meek v. Wal-Mart Stores*,

---

[9] In light of this well established presumption, we decline to adopt the totality of the circumstances approach that the defendant urges, which is used by a few federal courts of appeals. See, e.g., *Mekdeci v. Merrell National Laboratories*, 711 F.2d 1510, 1514–15 (11th Cir. 1983) (indicia of compromise verdict included insufficient compensatory damages award; numerous notes to trial court asking for clarification on specific issue; request to deliver verdict with explanation of reasons; and note indicating deadlock); see also *Yarbrough v. Sturm, Ruger & Co.*, 964 F.2d 376, 379 (5th Cir. 1992) ("[i]n determining whether a jury reached a compromise verdict, we examine the 'totality of circumstances' and consider any indicia of compromise apparent from the record and other factors that may have caused a verdict for damages that would be inadequate if the jury actually found liability").

*Inc.*, 72 Conn. App. 467, 490–92, 806 A.2d 546 (concluding presumption of regularity of jury deliberations such that no compromise verdict had been rendered had not been overcome because reasons for verdict other than compromise existed and no evidence of juror misconduct or manifest disregard of court's instructions), cert. denied, 262 Conn. 912, 810 A.2d 278 (2002). Moreover, "it is well established that, [i]n the absence of a showing that the jury failed or declined to follow the court's instructions, we presume that it heeded them." (Internal quotation marks omitted.) *State* v. *Carpenter*, 275 Conn. 785, 828, 882 A.2d 604 (2005), cert. denied, 547 U.S. 1025, 126 S. Ct. 1578, 164 L. Ed. 2d 329 (2006).

In the present case, the defendant has presented no evidence of juror misconduct, nor anything to suggest that the jury did not follow the court's instructions that they needed to reach a unanimous verdict. See footnote 5 of this opinion. Although the circumstances surrounding the deliberations might suggest that there was a debate over the defendant's liability, our review of the record and the jury's notes seeking assistance from the court indicates nothing out of the ordinary. It is not unusual for juries to send notes to the court seeking assistance or indicating confusion or disagreement. Indeed, all of the jury's notes indicate that it was endeavoring to adhere closely and carefully to the court's instructions and do the most thorough job possible. See footnote 3 of this opinion.

In addition, although it is possible that the initial verdict was a compromise—liability and economic damages in exchange for no noneconomic damages—it is equally, if not more, reasonable to assume that the jury reached a unanimous and firm decision as to liability, but was confused about noneconomic damages. As the trial court noted in its decision denying the defendant's motion to set aside the verdict, the jury could have misunderstood the permissive language in the court's original instruction that "you may consider

noneconomic damages" to mean that it was permissible for the jury to decline to consider such damages. The fact that the jury, upon reconsideration of the issue, expressed confusion as to how to determine an appropriate noneconomic damages award further suggests that the initial verdict was one based on misunderstanding, not a compromise reached after a bargaining process. Presented with various reasonable explanations for the jury's behavior, we cannot say that it was an abuse of discretion for the trial court to decline to grant the defendant's motion to set aside the verdict due to a compromise verdict.

B

The defendant next claims that the jury's reconsideration following its initial verdict should not have been limited to the issue of noneconomic damages. The defendant asserts that this claim is linked in a significant way to the claim we have addressed in part I A of this opinion. He contends that, because the circumstances indicate that one member of the jury had compromised his belief that the defendant was not liable in return for a verdict awarding zero noneconomic damages, the remedy, whether reconsideration or a new trial, should have included both liability and damages, not merely the award of noneconomic damages. In other words, the defendant contends that the problems with the compromise verdict were exacerbated by the narrow scope of the trial court's reconsideration instructions. On the basis of our analysis in part I A of this opinion, this claim also must fail.

Pursuant to General Statutes § 52-223,[10] the trial court was permitted to send the jury back for the reconsidera-

[10] General Statutes § 52-223 provides: "The court may, if it judges the jury has mistaken the evidence in the action and has brought in a verdict contrary to the evidence, or has brought in a verdict contrary to the direction of the court in a matter of law, return them to a second consideration, and for the same reason may return them to a third consideration. The jury shall not be returned for further consideration after a third consideration."

tion of the verdict up to three times. It long has been the rule that, when resubmitting a case, the trial court need not require the jury to reconsider all of the issues in the case. *State* v. *Bradley*, 134 Conn. 102, 114–15, 55 A.2d 114 (1947) (not improper for court to instruct jury to reconsider two of three counts in indictment), cert. denied, 333 U.S. 827, 68 S. Ct. 453, 92 L. Ed. 1112 (1948); see also *Van Nesse* v. *Tomaszewski*, 265 Conn. 627, 634, 829 A.2d 836 (2003) (not improper for court to send jury back to reconsider issue of damages only); *Cruz* v. *Drezek*, 175 Conn. 230, 240–42, 397 A.2d 1335 (1978) (not improper for court to send jury back to reconsider whether verdict was excessive). Similarly, we have concluded that it is permissible for the trial court to order a new trial limited to certain issues, if the issues are separable. *Fazio* v. *Brown*, 209 Conn. 450, 455, 551 A.2d 1227 (1988) ("[a]lthough . . . a trial court may limit a retrial to a specific issue or issues, [this authority is] clearly confined . . . to situations '[w]here the error as to one issue or issues is separable from the general issues . . . [and] such . . . limitation does not work injustice to the other issues or the case as a whole' " [citation omitted]), quoting *Murray* v. *Krenz*, supra, 94 Conn. 507. By contrast, if the court concludes that the verdict is a compromise verdict, "a new trial confined to the single [issue] of damage[s] will be a serious injustice to the [party seeking the new trial as] [h]e has never had the issue of liability determined by the conscientious conviction of all of the jur[ors]; and that he is entitled to have." (Internal quotation marks omitted.) *Mahon* v. *B.V. Unitron Mfg., Inc.*, 284 Conn. 645, 660, 935 A.2d 1004 (2007).

In light of our determination in part I A of this opinion that it was not an abuse of discretion for the trial court to presume regularity in the jury's finding of liability, and to reject the defendant's assertion that the verdict was a compromise verdict, there was no reason to send

the jury back to reconsider that issue. Put differently, the defendant had the issue of liability determined by the conscientious conviction of all of the jurors and, therefore, the issue of noneconomic damages reasonably was bifurcated by the court without inflicting injustice.[11] Any confusion that might have existed as to the issue of noneconomic damages properly was cured by the trial court's instructions and the jury's reconsideration.

## II

The defendant next contends that the verdict contingent settlement agreement that Wenkert and the plaintiffs reached during the trial should have been disclosed to him. Although the defendant does not contend that such agreements are per se improper, he contends that, under the facts of this case, the secrecy of the agreement was improper, because it unduly prejudiced him in that its nondisclosure deprived him of the opportunity to challenge certain evidence and impeach Wenkert's expert witness. We conclude that the plaintiffs should have disclosed the agreement, but that this error did not prejudice the defendant.

The following additional facts and procedural history are relevant to our resolution of this claim. The defendant conceded at oral argument that he and Wenkert were adversaries at trial. Our review of the trial record shows that the defendant attempted to prove that Lisa had presented no alarming symptoms when he discharged her from the hospital, but that her condition rapidly had deteriorated thereafter, and that it was Wenkert whom the plaintiffs really thought was liable. The defendant stated in his summation: "[W]hy wasn't [the defendant] made a party when this lawsuit was

---

[11] We note that it is no longer per se inadequate for the jury to award economic damages but no noneconomic damages. *Wichers* v. *Hatch*, 252 Conn. 174, 185–89, 745 A.2d 789 (2000) (disavowing previous per se rule).

commenced against [Wenkert] in 1998? . . . He wasn't sued because he wasn't negligent. . . . After [Wenkert] got sued she decided she was going to defend herself by, among other things, blaming somebody else." Wenkert attempted to prove that she had relied on the plaintiffs' representations to her that the defendant thoroughly had evaluated Lisa at the hospital and determined there was nothing medically wrong, adding that, had the defendant made the plaintiffs aware of a more serious condition, Wenkert would not have diagnosed Lisa as suffering from a panic attack. The plaintiffs attempted to prove that both physicians' conduct fell below the standard of care.

During the course of the trial, the plaintiffs and Wenkert executed a high-low settlement agreement (agreement).[12] The agreement acknowledged that Wenkert's Pennsylvania based liability insurance company was in "[r]ehabilitation/[l]iquidation" and that a Pennsylvania court had issued a stay barring its payment of any claims. At that time, it was unclear whether Wenkert would be eligible for reinsurance. The plaintiffs and Wenkert agreed therein that the plaintiffs would recover a maximum of $1 million and a minimum of $300,000, depending on the verdict, from either Wenkert's reinsurer or the Connecticut Guaranty Fund.[13] In exchange, the plaintiffs relinquished rights to recovery against Wenkert personally and any rights to prejudgment or postjudgment interest and costs.

[12] A copy of the agreement indicates that the plaintiffs signed it on March 18, 2005, and Wenkert's counsel signed it on March 6, 2005.

[13] Specifically, the agreement provided that if the plaintiffs obtained a verdict of $1 million or more against Wenkert, the plaintiffs would recover either $1 million from the reinsurer or $600,000 from the Connecticut Guaranty Fund. In the event of a recovery of between $300,000 and $1 million, then the reinsurer would pay the amount of the verdict or the Connecticut Guaranty Fund would pay $600,000 or the verdict, depending on which was the lesser sum. A verdict of $300,000 or less would result in a payment of $300,000 by the reinsurer or the Connecticut Guaranty Fund. Finally, in the event of a verdict for the defendant, either the reinsurer or the Connecticut Guaranty Fund would pay $300,000.

At the time the agreement was fully executed, the plaintiffs had rested their case, and Wenkert had testified. Part of the plaintiffs' case included the expert testimony of Thomas Gualtieri, a psychiatrist, that Wenkert's conduct had fallen below the standard of care because she failed to recognize that Lisa's purple lips (cyanosis) were a sign of a more serious condition than a panic attack. During her own testimony, Wenkert testified that, when Audrey Monti had called to make an appointment on the day that Lisa died, she told Wenkert that Lisa had been in the hospital with an allergic reaction, that she had been through a thorough work-up and that X rays had been taken, but that Lisa was discharged and said to be fine. Wenkert further testified that Audrey Monti had informed her that Lisa needed to see her because she was anxious and "panicking." The plaintiffs questioned Wenkert on cross-examination about her assessment of Lisa's symptoms and condition, and her ultimate conclusion that Lisa was merely hyperventilating, despite noticing that her lips had turned purple. The plaintiffs also questioned Wenkert about whether she would have made the same decision to see Lisa had Audrey Monti told her that Lisa had a more serious condition. Wenkert admitted that she would have directed Lisa to go to the hospital if there was some more serious medical condition, such as viral pneumonia, involved. In his closing argument, the plaintiffs' counsel focused on the defendant's allegedly negligent actions, but also argued that Wenkert's conduct had fallen below the standard of care and that she had missed a chance to save Lisa's life.

After trial and the split verdict between the defendant and Wenkert, the defendant became aware of the agreement. He was unable to obtain a copy directly from the plaintiffs, and therefore he made a motion for order to the trial court requesting that the plaintiffs

disclose the agreement to him, which the court granted. Shortly before the defendant filed his motion to set aside the verdict, the plaintiffs disclosed the agreement to him, pursuant to the court's order. Thereafter, in ruling on the defendant's motion to set aside the verdict, the trial court determined that the agreement was not the problematic type of secret settlement agreement known as a "Mary Carter agreement,"[14] and its nondisclosure had not prejudiced the defendant.

We note at the outset that the agreement in the present case differs significantly from the usual settlement agreement, wherein a settling defendant is withdrawn from the case and released from liability. Under the high-low settlement agreement in the present case, the settling defendant remained in the case and the extent of her liability was predicated on the amount of the verdict. Whether such an agreement must be disclosed, is an issue of first impression in this state. We therefore look to other jurisdictions for guidance. Although both parties agree that the agreement at issue is not a Mary Carter agreement, we look to that type of agreement as the starting point of our analysis because the other jurisdictions that have considered the issue have done so in reference to the rules governing the validity and disclosure of Mary Carter agreements.

A Mary Carter agreement "is a contract by which one or more defendants in a multi-party case secretly align themselves with the plaintiff and agree to continue as active defendants in the suit while working to aid in the plaintiff's case; in exchange, their own maximum liability will be diminished proportionately by increasing the liability of the nonagreeing defendant or defendants." *Vermont Union School District No. 21* v. *H.P. Cummings Construction Co.*, 143 Vt. 416, 426–27, 469

---

[14] This type of agreement derives its name from the case, *Booth* v. *Mary Carter Paint Co.*, 202 So. 2d 8 (Fla. App. 1967).

A.2d 742 (1983). It has four distinct features: "[(1) the] agreeing defendants must remain in the action in the posture of defendants . . . [(2) the] agreement must be kept secret . . . [(3) the] agreeing defendants guarantee to the plaintiff a certain monetary recovery regardless of the outcome of the lawsuit . . . [and (4) the] agreeing defendants' liability is decreased in direct proportion to the increase in the nonagreeing defendants' liability." Id., 427. Because these agreements secretly alter the adversarial nature of the relationship between the parties, they raise a serious threat to the fairness of the trial for the nonsettling defendant. *Dosdourian* v. *Carsten*, 624 So. 2d 241, 244 (Fla. 1993).

Some states note similar risks with regard to high-low agreements; those agreements "where the defendant and [the] plaintiff agree to a minimum and [a] maximum amount of a judgment notwithstanding the jury verdict . . . ." *27th Avenue Gulf Service Center* v. *Smellie*, 510 So. 2d 996, 998 (Fla. App. 1987); see also *Gulf Industries, Inc.* v. *Nair*, 953 So. 2d 590, 592–93 (Fla. App. 2007); *Hashem* v. *Les Stanford Oldsmobile, Inc.*, 266 Mich. App. 61, 84–85, 697 N.W.2d 558 (2005), application for leave to appeal dismissed, 711 N.W.2d 375 (Mich. 2006). These agreements do not have the liability-shifting feature of a Mary Carter agreement, and leave an incentive for the settling defendant to work to make the verdict as small as possible. *Hashem* v. *Les Stanford Oldsmobile, Inc.*, supra, 84–85. They do, however, set a fixed range of damages against the settling defendant and could therefore affect a shift in the proceedings. For example, the settling defendant might expend less resources to defend against liability, knowing that he will have to pay some minimum amount regardless of the verdict. Similarly, the plaintiff might more vigorously pursue liability against the nonsettling defendant because there is no cap on a verdict against him.

Although only a handful of states have declared Mary Carter agreements to be per se invalid,[15] the majority of states to consider the issue has, in light of policies encouraging the settlement of disputes, simply adopted rules to curb abuses attendant to any type of verdict contingent settlement, whether Mary Carter or high-low agreements, requiring these agreements to be disclosed to the court, to the other codefendants and sometimes to the jury. See, e.g., *Mustang Equipment, Inc. v. Welch*, 115 Ariz. 206, 208–11, 565 P.2d 895 (1977); *Burkett v. Crulo Trucking Co.*, 171 Ind. App. 166, 177–79, 355 N.E.2d 253 (1976); *Smith v. Payne*, 839 So. 2d 482, 486–87 (Miss. 2002); *Carter v. Tom's Truck Repair, Inc.*, 857 S.W.2d 172, 176–78 (Mo. 1993); *In the Matter of Eighth Judicial District Asbestos Litigation*, 8 N.Y.3d 717, 722–23, 872 N.E.2d 232, 840 N.Y.S.2d 546 (2007); *Grillo v. Burke's Paint Co.*, 275 Or. 421, 426–28, 551 P.2d 449 (1976); *Slusher v. Ospital*, 777 P.2d 437, 444 (Utah 1989); *State ex rel. Vapor Corp. v. Narick*, 173 W. Va. 770, 773, 320 S.E.2d 345 (1984). Disclosure to the jury, however, is not automatic; rather, whether and the extent to which the agreement is disclosed is an evidentiary issue within the sound discretion of the trial court. See, e.g., *Soria v. Sierra Pacific Airlines, Inc.*, 111 Idaho 594, 603–605, 726 P.2d 706 (1986), on appeal after remand, 114 Idaho 1, 752 P.2d 603 (1987); *Ratterree v. Bartlett*, 238 Kan. 11, 29–30, 707 P.2d 1063 (1985). For example, these agreements may be used to impeach the settling defendant if he testifies at trial, but are not permitted to be used for the purpose of proving liability or damages.[16] See, e.g., Cal. Civil Proc.

[15] *Dosdourian v. Carsten*, supra, 624 So. 2d 246; *Schwartz v. Eliades*, 113 Nev. 586, 590–91, 939 P.2d 1034 (1997); *Cox v. Kelsey-Hayes Co.*, 594 P.2d 354, 359–60 (Okla. 1978); *Elbaor v. Smith*, 845 S.W.2d 240, 250 (Tex. 1992).

[16] The Kansas Supreme Court has set forth the following rule in this respect: "When a settlement agreement is entered into between the plaintiff and one or more, but not all, alleged defendant tortfeasors, the parties entering into such agreement shall promptly inform the court in which the action is pending and the other parties to the action of the existence of the agreement and its terms. If the action is tried to a jury and a defendant who

Code § 877.5 (Deering 2008); *Stockstill* v. *C.F. Industries, Inc.*, 665 So. 2d 802, 812–13 (La. App. 1995), cert. denied, 669 So. 2d 428 (La. 1996); *General Motors Corp.* v. *Lahocki*, 286 Md. 714, 727–30, 410 A.2d 1039 (1980); *Bedford School District* v. *Caron Construction Co.*, 116 N.H. 800, 804–806, 367 A.2d 1051 (1976); *In the Matter of Eighth Judicial District Asbestos Litigation*, supra, 723; *Hatfield* v. *Continental Imports, Inc.*, 530 Pa. 551, 558–60, 610 A.2d 446 (1992).

Like these jurisdictions, it is the sound public policy of Connecticut to encourage parties to settle their disputes and to avoid protracted litigation. *Cardenas* v. *Mixcus*, 264 Conn. 314, 321, 823 A.2d 321 (2003); *Allstate Ins. Co.* v. *Mottolese*, 261 Conn. 521, 531, 803 A.2d 311 (2002); see also General Statutes § 52-192a. We agree that these types of verdict contingent settlement agreements, under most circumstances, serve this end. We also agree, however, that these agreements and their potential effect on the adversarial balance of the proceedings can pose a threat to the fairness of the trial for nonsettling defendants. For that reason, we adopt the following rule. All verdict contingent settlement agreements promptly must be disclosed to the court and any nonsettling defendants. Congruent with § 4-8 (a) of the Connecticut Code of Evidence, such agreements may not be used to prove liability or dam-

is a party to the agreement is a witness, the court shall, upon motion of a party, disclose the existence and content of the agreement to the jury unless the court finds in its discretion such disclosure to the jury will create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury. The disclosure of the settlement agreement to the jury herein required shall be no more than the court deems necessary to apprise the jury of the essential nature of the agreement and the possibility the agreement may bias the testimony of the parties who entered into the agreement. In no instance shall the amount of the settlement or any specific contingencies be disclosed to the jury, except the jury shall be apprised in general terms of the financial interest in the outcome of the case of any defendant who is a party to such an agreement." *Ratterree* v. *Bartlett*, supra, 238 Kan. 29–30.

ages. The trial court may, however, in the exercise of its discretion, permit these agreements to be used for the limited purpose of showing the bias or prejudice of a witness[17] with an appropriate cautionary instruction, provided that the evidence is not otherwise barred by other rules.[18] As with any other evidentiary ruling raising nonconstitutional concerns, a trial court's decision as to whether to admit such an agreement, and for what purpose, would be reviewed for an abuse of discretion. *State* v. *George J.*, 280 Conn. 551, 592, 910 A.2d 931 (2006), cert. denied, 549 U.S. 1326, 127 S. Ct. 1919, 167 L. Ed. 2d 573 (2007).

We agree with the defendant that the agreement in the present case was not a Mary Carter agreement because it did not contain the liability shifting provision characteristic of those agreements. It was, nevertheless, a high-low agreement bearing similar risks. Therefore, it was improper for the plaintiffs and Wenkert not to have disclosed it promptly upon its execution *both* to the court and to the defendant. With the above principles in mind, therefore, we must determine whether their failure to do so was so prejudicial to the defendant so as to warrant a reversal. See *Ryals* v. *Hall-Lane Moving & Storage Co.*, 122 N.C. App. 134, 138, 468 S.E.2d 69 (1996) (refusing to determine whether agreement was invalid Mary Carter agreement and concluding that reversal was not proper because defendant was not prejudiced by nondisclosure of agreement).

---

[17] Congruent with the limited exceptions under § 4-8 (b) of the Connecticut Code of Evidence, we caution trial judges to be extremely careful in exercising their discretion when considering any exception.

[18] We need not decide whether other principles might apply to any other limitations on or other uses of the evidence. See, e.g., General Statutes § 52-216a (providing that agreements not to bring action or release defendant from liability are inadmissible at trial); but see *Donner* v. *Kearse*, 234 Conn. 660, 676, 662 A.2d 1269 (1995) ("§ 52-216a does not erect a total bar that prevents a jury from ever considering the terms of a release agreement as evidence").

In the present case, the agreement did not change the adversarial alignment of the parties. The record makes clear that Wenkert and the defendant were adversaries from the beginning of the litigation, when Wenkert's apportionment complaint brought the defendant into the case. Wenkert attempted throughout the trial to prove that, when diagnosing Lisa as having a panic attack, she had relied on the defendant's representation to the plaintiffs that Lisa had been medically cleared. The defendant asserted that Lisa's symptoms had escalated after she left the hospital and that he was, therefore, not negligent in failing to diagnose her more serious condition. Significantly, the agreement was executed after the plaintiffs rested their case and after Wenkert testified in her own defense, maintaining her strategy of attempting to shift liability to the defendant and to prove that her own conduct did not fall below the standard of care or cause Lisa's death. Thus, there is no evidence that the agreement created a more adversarial relationship between the defendant and Wenkert than that which predated the agreement.

Moreover, because the plaintiffs and Wenkert executed the agreement after the plaintiffs had rested their case and the plaintiffs and Wenkert had testified, the value of the agreement for impeachment purposes of those witnesses is dubious at best. Our review of the transcripts and the record, has revealed no evidence that the nondisclosure of the high-low agreement impaired the defendant's cross-examination of the plaintiffs or Wenkert, or the defendant's ability to present his own defense.[19]

---

[19] The plaintiffs' counsel questioned both Wenkert and Gerry Rosenbaum, her psychiatric expert, extensively about Wenkert's assessment of Lisa's condition when she had arrived at Wenkert's office. After Wenkert rested, the defendant went on to present his case, including three medical experts (an infectious disease specialist, another family practice physician and a pulmonary specialist) who testified that the defendant's conduct had not fallen below the standard of care.

The defendant nonetheless contends that, had he known about the agreement, he would have: (1) offered the agreement into evidence and utilized it on cross-examination; (2) cross-examined Gualtieri, the plaintiff's psychiatric expert; (3) more aggressively cross-examined Wenkert's psychiatric expert, Gerry Rosenbaum; (4) put on his own psychiatric expert; and (5) more aggressively pursued Wenkert on cross-examination or in closing arguments. With regard to the defendant's first contention, again, we fail to see how the defendant would have impeached the plaintiffs or Wenkert with the agreement, because, even after they had signed the agreement, it remained in the plaintiffs' interests to obtain high verdicts against both Wenkert and the defendant. The defendant's other contentions similarly have little merit. Knowledge of the agreement could not have changed the defendant's incentive to cross-examine witnesses zealously or to pursue as vigorously as possible his original strategy of showing that there were no telltale signs for him of Lisa's true condition at the time of her discharge from the hospital. Thus, we conclude that the defendant was not prejudiced by the nondisclosure of the agreement so as to warrant a reversal.

## III

The defendant also maintains that the trial court should have set aside the verdict because the plaintiffs had failed to satisfy the statutory prerequisite to suit under § 52-190a of conducting a precomplaint inquiry into whether there was a good faith basis to bring the action against the defendant. He concedes that the plaintiffs' amended complaint included a certificate of good faith, which, under this court's holding in *LeConche* v. *Elligers*, 215 Conn. 701, 711–15, 579 A.2d 1 (1990), cured that particular filing defect. He also concedes that "evidence of the precomplaint inquiry is the certificate of good faith." He contends, however, that the

statute imposes a separate obligation to conduct such an inquiry, which is not necessarily cured by the amended complaint's certificate. The defendant maintains that the only evidence demonstrating such an inquiry, an "ex post facto assertion" to that effect by the plaintiffs' counsel,[20] cannot apply retroactively to demonstrate that the plaintiffs had conducted the necessary inquiry at the time that they filed their complaint against him. We reject the defendant's claim.

The following additional facts are relevant to the resolution of this issue. At the hearing on the defendant's motion to strike on August 9, 1999, the defendant argued that the court should strike the complaint because neither Wenkert's apportionment complaint nor the plaintiffs' complaint against him included a certificate of good faith. Counsel for the plaintiffs then stated on the record: "In this case . . . we did investigate a claim against [the defendant] and were not able to have somebody who we could rely on file a good faith certificate. We then sue[d] only [Wenkert]." The court denied the motion to strike without an oral or written opinion, and the record reflects no motion for articulation. Subsequently, the defendant filed a motion for summary judgment on the ground that the plaintiffs' complaint against him was legally insufficient because they had not filed a certificate of good faith with it. Nearly one year prior to ruling on the motion for summary judgment, the trial court, over the defendant's

---

[20] We presume that the defendant is referring to the following statement made by the plaintiff's counsel at the hearing on the defendant's motion to set aside the verdict: "We did, in fact, make a presuit investigation. [The attorney at the motion to strike hearing stated] that at the time we filed the action against [Wenkert], we did not have a good faith basis for suing [the defendant]. He did not say that we didn't have a good faith basis when we sued [the defendant]. And in fact, I have a good faith basis. I was the one who had the good faith basis. I was the one who signed the certificate and I will represent to the court that it was prior to the time that we filed suit against [the defendant]."

objection, had granted the plaintiffs' request to file an amended complaint that included a certificate of good faith.[21] At the hearing on the motion for summary judgment, the plaintiffs' counsel noted that "there is a provision for addressing the merits of the good faith certificate under [§] 52-190a, but that . . . can be done after completion of discovery upon proper motion." He then asserted: "I do have a reasonable basis [for the claim against the defendant] and at some point . . . if the court determines that it is appropriate to make that inquiry, I would be happy to provide the basis for the good faith certificate." The trial court orally denied the defendant's motion for summary judgment, stating: "[T]he basis of your motion for summary judgment is that there was a failure to file a good faith certificate and the complaint has been amended and now there is a good faith certificate. So, on that basis alone . . . and given in light of the decision in *LeConche*, it's the court's view that the motion for summary judgment should be . . . denied."

The day before the start of evidence at trial, the trial court considered motions in limine filed by the plaintiffs and the defendant. The plaintiffs had moved to preclude evidence at trial as to their attorney's statement concerning the precomplaint investigation and their written response to the defendant's request for an admission that they originally had been unable to obtain an opinion of a health care provider to support a claim against the defendant. The defendant filed his own motion in limine to preclude "expert testimony on the standard of care

---

[21] The plaintiffs explained at oral argument on the defendant's summary judgment motion that they previously had not filed a request to amend their complaint to include a good faith certificate because the trial court had denied the defendant's motion to strike the complaint. It was not until the defendant renewed the claim, this time in his motion for summary judgment, that the plaintiffs decided to file the good faith certificate out of concern that they would not be permitted later to amend were the court to grant the defendant's motion.

and deviations therefrom . . . as a result of [the] plaintiffs' binding judicial admissions that no such evidence is available" because the plaintiffs originally had failed to proffer a good faith basis for their action. The trial court granted the plaintiffs' motion and denied the defendant's motion. The defendant then made an oral motion for the trial court "to conduct an inquiry pursuant to [§] 52-190a [into the] basis for [t]he plaintiff's good faith certificate," which the trial court denied on the basis of its determination that the issue had been before the court on numerous occasions.

At the time the plaintiffs filed their complaint against the defendant, § 52-190a (a) provided in relevant part: "[An] attorney or party filing [an action to recover damages resulting from personal injury or death in which it is alleged the injury or death resulted from the negligence of a health care provider must make] a reasonable inquiry as permitted by the circumstances to determine that there are grounds for a good faith belief that there has been negligence in the care or treatment of the claimant. The complaint or initial pleading shall contain a certificate . . . that such reasonable inquiry gave rise to a good faith belief that grounds exist for an action against each named defendant. For purposes of this section, such good faith may be shown to exist if the claimant or his attorney has received a written opinion . . . of a similar health care provider . . . that there appears to be evidence of medical negligence. In addition to such written opinion, the court may consider other factors with regard to the existence of good faith. If the court determines after the completion of discovery, that such certificate was not made in good faith and that no justiciable issue was presented against a health care provider that fully cooperated in providing informal discovery, the court . . . shall impose upon the person who signed such certificate, a represented party or both, an appropriate sanction . . . ." General

Statues (Rev. to 1999) § 52-190a (a). Although the legal requirements of the statute present questions of law over which we exercise plenary review; *Lydall, Inc.* v. *Ruschmeyer*, 282 Conn. 209, 246, 919 A.2d 421 (2007); a trial court's determination as to whether the good faith precomplaint investigation requirement has been met is reviewed for an abuse of discretion. See *David M. Somers & Associates, P.C.* v. *Busch*, 283 Conn. 396, 407, 927 A.2d 832 (2007).

In *LeConche* v. *Elligers*, supra, 215 Conn. 711–15, this court construed the same version of the statute at issue in this case when considering whether the requirements therein were jurisdictional. The court held that the trial court improperly had dismissed a complaint for lack of subject matter jurisdiction because: (1) the operative complaint did not include a certificate of good faith; and (2) the trial court found that the statement of the plaintiffs' counsel in a certificate of good faith that the plaintiffs sought to submit in conjunction with a proposed amended complaint did not establish a reasonable precomplaint inquiry. Id. This court concluded that the failure to file a certificate of good faith is a nonjurisdictional defect that may be cured by timely amendment of the complaint. Id., 711. Although the court stated that "[t]he statute . . . requires a factual inquiry by the [trial] court [after discovery] regarding the sufficiency of the precomplaint investigation"; id., 708; that statement must be understood in proper context. The court determined that "the statute *permitted* the plaintiffs in this case to establish a reasonable precomplaint inquiry by reference to factors beyond the certificate evidencing their good faith"; (emphasis added) id., 709; and, therefore, the trial court improperly had "based its finding of a lack of reasonable precomplaint inquiry on an unduly limited factual inquiry and record . . . ." Id. The court did not conclude that, in every case, a certificate of good faith is per se inade-

quate to establish that a plaintiff has conducted the requisite inquiry. Indeed, the court stated: "The purpose of the certificate is to evidence a plaintiff's good faith derived from the precomplaint inquiry. It serves as an assurance to a defendant that a plaintiff has *in fact* made a reasonable precomplaint inquiry giving him a good faith belief in the defendant's negligence." (Emphasis added.) Id., 711.

Even if we were to assume, without deciding, that it was improper for the trial court, after discovery had concluded, not to follow the mandate of § 52-190a and to conduct the hearing inquiring into the basis for the plaintiffs' certificate of good faith, the defendant has not met his burden of showing that any such impropriety was harmful. See *State* v. *George J.*, supra, 280 Conn. 592. This case proceeded through a month long trial, in which the jury, as a finder of fact, had the opportunity to hear evidence as to whether the defendant's negligent treatment of Lisa was the cause of her death. The purpose of the good faith certificate is to prevent frivolous suits. *LeConche* v. *Elligers*, supra, 215 Conn. 710. The sanction for certificates not filed in good faith may be "an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion or other paper, including a reasonable attorney's fee," as well as discipline of the attorney who filed the certificate. General Statutes (Rev. to 1999) § 52-190a (a). In *LeConche*, we also assumed, without deciding, that the sanction for filing a false certificate *may* be dismissal of the complaint. *LeConche* v. *Elligers*, supra, 712; see also General Statutes § 52-190a (c) (current revision of statute includes new subsection, added in 2005, providing that dismissal is appropriate sanction for filing false certificate). In the present case, there is no allegation of fraud, and § 52-190a provides us with no basis on which we could set aside a jury verdict because of the failure to conduct

a precomplaint inquiry. Certainly any questions as to the original basis for the action against the defendant have now been resolved by a jury verdict.

## IV

Finally, the defendant contends that the trial court improperly awarded prejudgment interest pursuant to General Statutes (Rev. to 1999) § 52-192a (b).[22] He contends that, because the plaintiffs had made separate offers of judgment to the defendant and to the defendant doing business as Ellington Family Practice, each for $1 million, the threshold for the award of prejudgment interest is $2 million, which is more than the plaintiff recovered against him. The plaintiffs respond that the defendant and his medical practice are one and the same for purposes of this litigation and, therefore, the threshold for an award of prejudgment interest was $1 million. We agree with the plaintiffs.

The following additional facts are relevant. Prior to trial, the plaintiffs filed two offers of judgment. The first offered to stipulate judgment in the amount of $1 million as against "Mark J. Decker, only." The second was identical in amount and language, except that it stipulated judgment as against "Mark J. Decker, d/b/a Ellington Family Practice, only." After the jury returned

---

[22] General Statutes (Rev. to 1999) § 52-192a (b) provides in relevant part: "After trial the court shall examine the record to determine whether the plaintiff made an 'offer of judgment' which the defendant failed to accept. If the court ascertains from the record that the plaintiff has recovered an amount equal to or greater than the sum certain stated in his 'offer of judgment', the court shall add to the amount so recovered twelve per cent annual interest on said amount, computed from . . . the date the complaint in the civil action was filed with the court if the 'offer of judgment' was filed not later than eighteen months from the filing of such complaint. If such offer was filed later than eighteen months from the date of filing of the complaint, the interest shall be computed from the date the 'offer of judgment' was filed. . . ."

a verdict against the defendant for $1.75 million, which was more than the $1 million offer of judgment, the trial court awarded prejudgment interest on that amount at a rate of 12 percent, pursuant to § 52-192a.

"[I]t appears well settled that the use of a fictitious or assumed business name does not create a separate legal entity . . . [and that] [t]he designation [doing business as] . . . is merely descriptive of the person or corporation who does business under some other name . . . . [I]t signifies that the individual is the owner and operator of the business whose trade name follows his, and makes him personally liable for the torts and contracts of the business . . . ." (Citations omitted; internal quotation marks omitted.) *Edmands* v. *CUNO, Inc.*, supra, 277 Conn. 454 n.17, citing *Bauer* v. *Pounds*, 61 Conn. App. 29, 36, 762 A.2d 499 (2000).

In light of the aforementioned principles, the defendant was individually liable for the entire verdict. Thus, his acceptance of the offer of judgment for $1 million would have ended the litigation entirely as to the count against him and the identical count against the defendant doing business as Ellington Family Practice. It is of no significance that the plaintiffs made two offers of judgment. Moreover, there is nothing in the record to overcome the presumption that the defendant and his medical practice should be treated as one entity. Accordingly, it was not improper for the trial court to award prejudgment interest.[23]

The judgment is affirmed.

In this opinion the other justices concurred.

---

[23] In a footnote in his brief, the defendant contends that the proper interest rate was 8 percent, not 12 percent, because § 52-192a was amended in 2005 to revise the rate. See Public Acts 2005, No. 05-275, § 4. Public Act 05-275 expressly applies to actions accruing on or after October 1, 2005; thus the rate of interest properly was calculated at 12 percent.