IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

DONALD COLLINGS and BETH
COLLINGS, husband and wife,

      Respondent,

      v.

CITY FIRST MORTGAGE SERVICES,
LLC, a Utah limited liability company
f/k/a CITY FIRST MORTGAGE
SERVICES, L.C.; U.S. BANK
NATIONAL ASSOCIATION AS
TRUSTEE FOR THE GREENPOINT
MORTGAGE FUNDING TRUST
MORTGAGE PASS-THROUGH
CERTIFICATES, SERIES 2007-ARI,

      Appellants,

HOME FRONT HOLDINGS, LLC, a
Utah limited liability company; ROBERT
P. LOVELESS and REBECCA
LOVELESS, husband and wife;
ANDREW J. MULLEN AND "JANE
DOE" MULLEN, husband and wife;
GAVIN SPENCER and MARGARET
ELIZABETH SPENCER, husband and
wife; FIRST AMERICAN TITLE
INSURANCE COMPANY, a California
corporation, Trustee; "MERS"
MORTGAGE ELECTRONIC
REGISTRATION SYSTEMS, INC., a
Delaware corporation; and JOHN DOES
1 – 12, unnamed co-conspirators,

      Defendants,

EXECUTIVE TRUSTEE SERVICES,
LLC, a foreign company,

      Third-Party
      Defendant.

No. 66527-8-I
(consolidated with 66820-0-I)

ORDER GRANTING MOTION
FOR RECONSIDERATION
IN PART, WITHDRAWING
AND SUBSTITUTING OPINION,
AND DENYING MOTION TO
FILE SUPPLEMENTAL BRIEFING

City First Mortgage Services LLC has filed a motion for leave to submit supplemental briefing addressing <u>Barton v. State Department of Transportation</u>, No. 86924-3. The panel has determined this motion should be denied.

City First has also moved for reconsideration on two issues: first, whether nondisclosure of the covenant not to execute warrants a new trial, and second, whether the court should set aside the jury's award of punitive damages under Washington's Credit Services Organizations Act, chapter 19.134 RCW.

As to the first issue, reconsideration is denied.

As to the second issue, City First's opening brief of appellant raised the issue insofar as it relates to being licensed under state law, and this court failed to address it. Accordingly, the original opinion filed on July 29, 2013, will be withdrawn and a substitute opinion will be issued, in which the court will address the issue by inserting an additional section beginning on page 20, before "U.S. Bank," as follows:

## CITY FIRST
### ISSUE FOUR: Credit Services Organizations Act

City First contends that the Collings' claim that City First violated the Credit Services Organizations Act, chapter 19.134 RCW, fails as a matter of law. City First argues that it was excluded from the Act's coverage under RCW 19.134.010(2)(b)(i) because it was subject to regulation by Washington State, having been licensed as a consumer loan company by the Washington State Department of Financial Institutions. City First first raised the argument below in its trial brief and in a motion for judgment as

a matter of law that was presented to the trial court after the court heard exceptions to the instructions.

Collings' brief of respondent in response to City First argues that the Act does permit a violation to be found in the circumstances of this case, where the City First branches from which Loveless and Mullen operated in Utah were not licensed by Washington's Department of Financial Institutions.

Instruction 19 sets forth the requirement that "each branch" had to be licensed in order to be exempt under the Act. City First did not take exception to instruction 19. Moreover, as Collings argues, the Department's regulations support the "each branch" interpretation of the statute provided by instruction 19. We conclude the trial court did not err in denying City First's motions for judgment as a matter of law as to the issue of coverage under the Credit Services Organizations Act.

Now, therefore, it is hereby

ORDERED that appellants' motion for leave to submit supplemental briefing is denied. It is further

ORDERED that appellants' motion for reconsideration is granted in part. And it is further

ORDERED that the opinion filed July 29, 2013, is withdrawn and a substitute published opinion be filed in accordance with this order.

No. 66527-8-I/4

DATED this 18th day of November 2013.

Becker, J.

George, JR

FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON

2013 NOV 18 AM 9: 39

4

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| DONALD COLLINGS and BETH COLLINGS, husband and wife, | ) ) ) | No. 66527-8-I (consolidated with 66820-0-I) |
| Respondent, | ) ) | DIVISION ONE |
| v. | ) ) | |
| CITY FIRST MORTGAGE SERVICES, LLC, a Utah limited liability company f/k/a CITY FIRST MORTGAGE SERVICES, L.C.; U.S. BANK NATIONAL ASSOCIATION AS TRUSTEE FOR THE GREENPOINT MORTGAGE FUNDING TRUST MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-ARI, | ) ) ) ) ) ) ) ) ) ) | PUBLISHED OPINION |
| Appellants, | ) ) | FILED: November 18, 2013 |
| HOME FRONT HOLDINGS, LLC, a Utah limited liability company; ROBERT P. LOVELESS and REBECCA LOVELESS, husband and wife; ANDREW J. MULLEN AND "JANE DOE" MULLEN, husband and wife; GAVIN SPENCER and MARGARET ELIZABETH SPENCER, husband and wife; FIRST AMERICAN TITLE INSURANCE COMPANY, a California corporation, Trustee; "MERS" MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., a Delaware corporation; and JOHN DOES 1 – 12, unnamed co-conspirators, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |

No. 66527-8-I/2

EXECUTIVE TRUSTEE SERVICES, )
LLC, a foreign company, )
)
)
Third-Party )
Defendant. )
_____)

BECKER, J. — This consolidated case originated in a foreclosure rescue scheme. The trial court quieted title in the homeowners. One appellant, ordered to pay damages and attorney fees, contends a new trial should be granted because the homeowners did not disclose a settlement they reached pretrial with another defendant. Because no prejudice was shown, we reject this argument. The other appellant contends it holds a superior interest in the home. But that appellant was not a bona fide purchaser of the note and deed of trust it possesses. The judgments are affirmed.

## FACTS

Donald Collings and his wife, Beth, purchased their Redmond home in 1998. In 2005, a reduction in their income caused them to become concerned about falling behind in their payments on the home.

The appraised value of the home was $510,000, and Collings owed about $377,000 on it when, in early 2006, a flier came in the mail from appellant City First Mortgage Services LLC, advertising a program for people with credit problems. City First is a small mortgage company engaged in transacting the business of residential mortgage loans. Beth Collings called City First. Gavin Spencer, an employee at a City First branch in Utah, offered to help. Ms.

2

Collings applied for a loan over the phone. Soon, Spencer reported the loan was approved. Weeks later, after the purported closing date had been pushed back several times, Spencer told the Collingses the loan had not actually been approved but that his manager might be able to help. Spencer introduced the Collingses to Paul Loveless, a City First branch manager, and Andrew Mullen, a branch manager and loan officer.

According to Mr. Collings, Loveless said, "What we can do is buy your home. We will put it in my name."[1] Loveless proposed to buy the Collings home for its appraised value of $510,000, take out a mortgage on it, and then lease it back for $2,970 per month, using these funds to make payments on the mortgage. Collings would pay Loveless an up-front fee of $78,540 and sign a lease-back agreement with an option to repurchase the home after three years for $510,000.

According to Collings, he agreed to the deal on condition that the lease would prohibit Loveless from refinancing the home and from further encumbering it with a home equity line of credit. Loveless obtained title to the home and, as planned, took out a mortgage on it with City First. The deal closed in June 2006.

In July 2008, a foreclosure notice appeared on the house. Collings, who had timely made all the required monthly lease payments, contacted Loveless. Loveless threatened to evict the Collingses if they did not send him more money. Collings discovered that Loveless, in December 2006, had refinanced the loan with City First and had taken out a home equity line of credit, all in violation of the lease prohibition. This transaction, referred to as "the Loveless Loan," is at the

---

[1] Report of Proceedings (Sept. 14, 2010) at 28.

center of the ensuing controversy. Collings stopped paying Loveless and obtained legal representation.

In March 2009, Collings sued City First, Loveless, Mullen, Spencer and other parties who were later dismissed. The complaint sought damages and injunctive relief.

Meanwhile, City First had sold the Loveless Loan. The note and deed of trust passed into the hands of appellant U.S. Bank National Association as trustee for the Greenpoint Mortgage Pass-Through Certificates, Series 2007-AR1. The notice of foreclosure posted on the Collings home was part of a nonjudicial foreclosure instituted in response to Loveless' failure to make payments. Collings filed a lis pendens. Through a court order, he was able to stop the pending foreclosure.

In August 2009, U.S. Bank was granted the right to intervene. U.S. Bank sought a declaration that its security interest, as evidenced by its deed of trust, remained a viable, first priority encumbrance of record in the official records of King County and that it was entitled to payment in full of the debt secured by the deed of trust.

Loveless defaulted. It was undisputed that the Loveless Loan amounted to illegal equity skimming. See RCW 61.34.020(1)(b)(i)-(iv). In February 2010, the court found that Loveless, despite his name on the record title, held only an equitable mortgage. As against Loveless, title to the property was quieted in Collings, subject to any applicable valid and subsisting liens.

4

Trial began in September 2012. The jury was charged with two tasks. First, resolve the claims alleged in the Collings complaint. Second, issue advisory findings in the U.S. Bank case.

In the City First case, the jury returned a verdict finding Loveless, Mullen, and City First liable to the Collingses. The verdict held Loveless and City First liable for $40,311 in compensatory damages and also imposed $80,622 in punitive damages against the two of them under the Washington Credit Services Organizations Act, chapter 19.134 RCW. The jury assessed $8,000 in punitive damages against Mullen, but no compensatory damages. The court denied City First's posttrial motions and entered a judgment against it.

The trial court also entered judgment in favor of the Collingses in the U.S. Bank case. The court declared the deed of trust held by U.S. Bank void and unenforceable, permanently enjoined U.S. Bank from foreclosing on the Collings home, and quieted title in the Collingses as against U.S. Bank. City First and U.S. Bank appeal from the judgments entered against them.

## CITY FIRST
### ISSUE ONE:  Nondisclosure of Settlement Agreement

After the verdict, City First moved unsuccessfully for a new trial under CR 59. One basis for the motion was City First's discovery of a previously undisclosed pretrial settlement. The Collingses, in exchange for Mullen's promise to pay $500, had agreed they would not execute any judgment they obtained against Mullen.

The litigation of City First's motion for a new trial and the order denying that motion focused primarily on whether the covenant not to execute against Mullen had the effect of releasing City First from its vicarious liability for the acts of Loveless or Mullen. The court concluded that if the settlement did release City First from any judgment rendered against Mullen, it did not release anyone else. The judgment against City First would stand to the extent it was based either on vicarious liability for the acts of Loveless or its own independent acts.[2]

On appeal, City First is concerned with the significance of the nondisclosure of the Mullen settlement, not with the argument that the settlement operated as a release. Mullen remained a defendant after the settlement, and his 70-page deposition was read into evidence in the plaintiffs' case. City First argues that the settlement was a collusive agreement and that its nondisclosure tainted the trial.

The order denying the motion for a new trial is reviewed for abuse of discretion. McCluskey v. Handorff-Sherman, 68 Wn. App. 96, 103, 841 P.2d 1300 (1992), aff'd, 125 Wn.2d 1, 882 P.2d 157 (1994). A trial court abuses its discretion when its decision is manifestly unreasonable or based upon untenable grounds. Havens v. C&D Plastics, Inc., 124 Wn.2d 158, 168, 876 P.2d 435 (1994). A court also abuses its discretion when it "uses an incorrect standard of law or the facts do not meet the requirements of the standard of law." Sherron Assocs. Loan Fund V (Mars Hotel) LLC v. Saucier, 157 Wn. App. 357, 361, 237 P.3d 338 (2010), review denied, 171 Wn.2d 1012 (2011).

---

[2] Clerk's Papers at 1859-63, Order Re: Mullens Release and Motion for New Trial, Mar. 24, 2011.

6

City First contends the Mullen-Collings settlement was a "Mary Carter" agreement, one in which a defendant remains in the trial after settling with the plaintiff in exchange for a limitation of liability. The "Mary Carter" denomination derives from Booth v. Mary Carter Paint Co., 202 So. 2d 8 (Fla. Dist. Ct. App. 1967). "The key elements of a Mary Carter agreement are a limitation of the settling defendant's liability, a requirement that that defendant remain in the trial, and a guarantee of a certain sum of money to the plaintiff." J. Michael Philips, Looking Out for Mary Carter: Collusive Settlement Agreements in Washington Tort Litigation, 69 WASH. L. REV. 255, 257 (1994). Here the agreement did not require Mullen to remain in the trial, and it also did not give Mullen a financial interest in the Collingses' potential recovery from City First—an element in some definitions of a Mary Carter agreement. We will nevertheless examine the argument in light of the policy concerns about the potentially pernicious effect of undisclosed settlement agreements.

Washington law on the topic of undisclosed settlement agreements among the parties is sparse. While our courts have not set forth a definitive rule, we have acknowledged the potential for prejudice presented by such agreements. McCluskey, 68 Wn. App. at 103-04.

McCluskey was a wrongful death action arising from a two-car collision on a state highway. The two defendants were each held 50 percent liable for a sizable award of damages: the State of Washington for maintaining an unsafe highway, and the indigent and uninsured teenage driver for negligently operating his vehicle. On appeal, the State invoked the policy concerns about Mary Carter

7

agreements in its motion for a new trial. The State argued that the driver and the plaintiff, while outwardly appearing to be adversaries, had secretly colluded to obtain a verdict against the State as the defendant with the deep pocket. McCluskey, 68 Wn. App. at 102. We recognized that the "existence of an undisclosed agreement between outwardly adversarial parties at trial can prejudice the proceedings by misleading the trier of fact. . . . Where appellate courts have permitted such agreements, they also have required pretrial disclosure to the trial court. The trial court can then advise the jury of the agreement so that jurors can consider the relationship in evaluating evidence and the credibility of witnesses." McCluskey, 68 Wn. App. at 103-04, citing Daniel v. Penrod Drilling Co., 393 F. Supp. 1056 (E.D. La. 1975); Ward v. Ochoa, 284 So. 2d 385 (Fla. 1973) (holding Mary Carter agreements must be disclosed to jury upon proper motion), abrogated by Dosdourian v. Carsten, 624 So. 2d 241 (Fla. 1993) (holding Mary Carter agreements void and inadmissible); Maule Indus., Inc. v. Rountree, 284 So. 2d 389 (Fla. 1973); Ratterree v. Bartlett, 238 Kan. 11, 707 P.2d 1063 (1985). But we concluded that listing parallel positions taken by the plaintiff and the impecunious defendant was not enough to establish collusive conduct. Without direct evidence of some kind of agreement, there was no basis for a new trial. McCluskey, 68 Wn. App. at 103-05.

Here, City First does have evidence of an agreement. City First discovered the settlement in the course of reviewing billing records in connection with the plaintiffs' posttrial motion for attorney fees. Based in part on the lack of disclosure of the settlement agreement, City First moved for a new trial. In the

8

course of litigating the motion, City First obtained a declaration from Mullen stating that he was informed Collings would settle with him only if his deposition testimony was "acceptable."[3] And he said Collings executed the agreement after the deposition was completed in July 2010.

City First contends a new trial must be ordered because the failure to disclose the Mullen settlement before trial violated a duty that exists in Washington either as a common law duty, a statutory duty under RCW 4.22.060(2), or as an independent ethical duty of counsel.

Courts have adopted different approaches to Mary Carter agreements. Some jurisdictions have banned such agreements as a matter of policy. See, e.g., Dosdourian, 624 So.2d at 246; Cox v. Kelsey-Hayes Co., 1978 OK 148, ¶ 32, 594 P.2d 354, 360; Elbaor v. Smith, 845 S.W.2d 240, 250 (Tex. 1992). Others have allowed Mary Carter agreements but have required that they be disclosed. Hodesh v. Korelitz, 123 Ohio St. 3d 72, 2009-Ohio-4220, 914 N.E.2d 186, 189; Monti v. Wenkert, 287 Conn. 101, 124, 947 A.2d 261, 275 (Conn. 2008). Some of these courts have required that such agreements must be produced for examination before trial if there is a discovery request. Ward, 284 So. 2d at 387; see Grillo v. Burke's Paint Co., 275 Or. 421, 429, 551 P.2d 449 (1976) (affirming denial of a motion for a new trial based on posttrial discovery of settlement agreement because settlement could have been discovered before trial through due diligence).

---

[3] Clerk's Papers at 1773.

It is fair to say that Mary Carter agreements are not favored. But there is little support for the proposition that City First is trying to establish in this case: that an undisclosed Mary Carter agreement is automatic grounds for a new trial.

In general, for a trial court to grant a party's motion for new trial, prejudice is required. See Spratt v. Davidson, 1 Wn. App. 523, 526, 463 P.2d 179 (1969) (reversing order of new trial and stating the "existence of a mere possibility or remote possibility of prejudice is not enough"). And other courts, in rejecting arguments for a new trial premised on the existence of a Mary Carter agreement, have required prejudice. See, e.g., Med. Staffing Network, Inc. v. Connors, 313 Ga. App. 645, 649, 722 S.E.2d 370 (2012) (concluding that even if the litigants had disclosed their litigation agreement during trial, "it is unlikely that the jury would have reached a different verdict"), cert. denied, ___ U.S. ___ (May 29, 2012); Monti, 947 A.2d at 277 (concluding that "the defendant was not prejudiced by the nondisclosure of the agreement so as to warrant a reversal"). We adhere to our well-established rule that a showing of prejudice is required to warrant a new trial.

City First identifies three portions of the record that allegedly demonstrate how it was prejudiced by not being informed of the settlement with Mullen. The first is a declaration from Brian Hunt, general counsel for City First, submitted to support City First's motion for a new trial. Hunt states that during closing argument, counsel for Collings dramatically drew the jury's attention to the fact that Mullen and his wife did not personally attend the trial: "where are they?" and

10

"why aren't they here?"[4] City First argues that with evidence of the agreement to excuse Mullen from having to pay damages, the absence of Mullen could have been readily explained and the credibility of his testimony undermined.

A declaration purporting to describe what was said during court proceedings is not a substitute for a record. The parties agreed that closing argument would not be transcribed.[5] And City First did not try to make a narrative report of proceedings of closing argument for review. See RAP 9.3 (rule allowing narrative report of proceedings); see also Allstate Ins. Co. v. Huston, 123 Wn. App. 530, 544-45, 94 P.3d 358 (2004) (record insufficient to decide issue and noting that party did not attempt to have an agreed or narrative report of proceedings created), review denied, 153 Wn.2d 1021 (2005). As a result of City First's failure to preserve the pertinent record in any way other than its own self-serving declaration, we must disregard the allegation of prejudice in closing argument.

Second, Mullen stated in his posttrial declaration that he was told Collings would agree to execute a covenant not to enforce judgment against him only if his deposition testimony was "acceptable." While the potential for tailored testimony certainly exists in these circumstances, City First does not show that any specific statement Mullen made was false or misleading. In our review of Mullen's deposition, we find nothing to suggest that his answers were crafted to aid the Collingses against City First. His testimony was largely consistent with the testimony of Sherri Russett, a City First employee since December 2009 who

---

[4] Clerk's Papers at 1776.
[5] See Report of Proceedings (Feb. 25, 2011) at 7.

testified about how City First operated. City First simply does not explain what it would have or could have done differently with Mullen as a witness if it had known the Collingses had agreed not to pursue judgment against him.

Third, City First contends the jury must have been misled by instructions that implied Mullen was actively defending at trial against the allegations of the Collingses, when in reality he was not at risk of having to pay damages.[6] But City First does not explain how the outcome of the trial would have been different if the jury had instead been informed about Mullen's settlement with the Collingses. Certainly, the nondisclosure of the settlement deprived City First of an opportunity to inquire into the circumstances surrounding the settlement agreement and from asking Mullen about whether the covenant not to execute influenced his testimony. But this abstract possibility of prejudice, which will be present whenever a settlement agreement is kept secret, is too speculative to justify a new trial. We conclude a concrete showing of actual prejudice is necessary and City First has not made such a showing. We decline the invitation to use this case to make a definitive holding concerning Mary Carter-type agreements and the circumstances under which they must be disclosed. The trial court did not abuse its discretion by denying City First a new trial based on the lack of disclosure of the Mullen-Collings agreement.

---

[6] See, e.g., Clerk's Papers at 856, Instruction 14, allowing the jury to find City First vicariously liable for Mullen's acts within the scope of his employment for City First.

12

**CITY FIRST**
**ISSUE TWO: Sufficiency of the Evidence**

Use of a general verdict

City First contends there was insufficient evidence of its liability on all the various claims asserted by the Collingses.

The jury was provided a special verdict form with 10 questions. The verdict form simply referred to the "claims" of the plaintiff, except for question 8, which referred specifically to the claim of violation of the Credit Services Organizations Act, chapter 19.134 RCW.[7] The verdict form did not single out any of the other claims submitted to the jury, which included consumer protection violations and other statutory claims as well as civil conspiracy. Answering question 1, the jury found Loveless and Mullen "liable to the Collings on their claims."[8] Answering question 3, the jury found City First vicariously liable for the acts of Loveless, Mullen, and Spencer. Answering question 5, the jury found City First independently liable on the plaintiffs' "claims." Answering question 8, the jury found City First, Loveless, and Mullen liable to Collings for violation of the Credit Services Organizations Act.

City First maintains that we must review for sufficient evidence every theory of liability on which the jury was instructed and that if any of the theories or claims fails, reversal is required because it is impossible to determine what grounds the verdict rests on.

---

[7] The separate question regarding this alleged violation was apparently needed because it was the only claim that could give rise to an award of punitive damages. See RCW 19.134.080(1).

[8] Clerk's Papers at 898.

City First relies on two early Washington Supreme Court cases:

S. Yamamoto v. Puget Sound Lumber Co., 84 Wash. 411, 146 P. 861 (1915), and

Chase v. Knabel, 46 Wash. 484, 90 P. 642 (1907). These cases embody the

Baldwin principle, named after Maryland v. Baldwin, 112 U.S. 490, 5 S. Ct. 278,

28 L. Ed. 822 (1884). Davis v. Microsoft Corp., 149 Wn.2d 521, 539-40, 70 P.3d

126 (2003). In a case in which the jury may base its verdict on one of a number

of theories of liability asserted by the plaintiff and one of the theories is later

invalidated on appeal, remand for a new trial is required under the Baldwin

principle on the rationale that it is improper for an appellate body to attempt to

divine the defense or theory upon which the jury has based its decision. Davis,

149 Wn.2d at 539.

In Davis, the Supreme Court adopted an exception to the Baldwin

principle and held that remand for a new trial is required only if the defendant

objected to the use of a general verdict and proposed a clarifying special verdict

form. Davis, 149 Wn.2d at 539-40; 15A KARL B. TEGLAND & DOUGLAS J. ENDE,

WASHINGTON PRACTICE: WASHINGTON HANDBOOK ON CIVIL PROCEDURE § 88.6, at

738-40 (2012-2013 ed.).

Yamamoto and Chase have been eclipsed to the extent they are

inconsistent with Davis. As Davis is the later opinion, we are obliged to follow it.

See Puget Mill Co. v. Kerry, 183 Wash. 542, 559, 49 P.2d 57 (1935); State v.

Martin, 149 Wn. App. 689, 695, 205 P.3d 931 (2009).

City First attempts to distinguish the Davis exception as a case involving

multifactual theories, not different causes of action. City First cites no authority

supporting this distinction and makes no policy argument explaining why the distinction is material. We conclude Davis applies. Because City First did not propose a special verdict form that would have clarified on what grounds the jury rested its verdict, City First cannot gain a new trial merely by showing that at least one of Collings' claims fails for insufficient evidence. Rather, the converse is true: so long as at least one of Collings' theories is sufficiently supported by the evidence, the verdict will stand. As discussed below, we conclude there was sufficient evidence to support vicarious liability on the part of City First for the wrongful conduct of Loveless, who defaulted on every claim. Accordingly, it is unnecessary to discuss the sufficiency of the evidence supporting the remaining theories of liability against City First.

Vicarious liability for the acts of Loveless

City First contends there was insufficient evidence that City First was vicariously liable for the conduct of Loveless.

The jury was instructed that Loveless was liable as a matter of law and that City First could be held liable for the actions of Loveless if he was acting within the scope of employment or agency of City First:

> You must find for the Collings with respect to each of their claims against defendant Robert P. Loveless. However, the Collings still have the burden to prove the amount of their actual damages with respect to each of their claims against defendant Robert P. Loveless.
> No other defendant is liable merely because you must find for the Collings against defendant Robert P. Loveless. However, you may find a particular defendant liable for the acts of defendant Robert P. Loveless if you find that:
> (1) Defendant Robert P. Loveless was acting within the scope of employment or agency of that particular defendant; . . .

Instruction 6. On the meaning of "scope of employment," the jury was instructed:

> An employee acts within the scope of authority if the employee is performing duties that were expressly or impliedly assigned to him or her by his or her employer or that were expressly or impliedly required by the contract of his employment. Likewise, the employee is acting within the scope of authority if the employee is engaged in the furtherance of the employer's interests.

Instruction 10.

The evidence showed that Loveless and Mullen owned Home Front Holdings LLC, an entity designated as the landlord in the lease-back agreement Loveless set up with Collings. They also owned Home Front Services LLC, an entity that operated two branch offices of City First. City First maintains its Home Front branch offices operated independently so that Loveless was neither an employee nor an agent of City First.

There was substantial evidence to contradict City First's contention that Home Front Services was completely responsible for the day-to-day operations of the branch office and for preparing the loan documents that originated out of it. Loveless's job was to generate loans for City First. City First paid Loveless and profited from the loans he made. All of the loans done by the branch were through City First. Advertising and communication directed at Collings, including e-mail from Loveless, bore the City First label. City First retained the right to approve the solicitations and advertising generated by Home Front Services. Collings thus had reason to believe he was dealing with City First when he entered into the sale and lease-back agreement with Loveless. A reasonable jury could readily find that Loveless, designated as the branch manager, was an employee or agent of City First.

16

City First did not expressly direct Loveless to enter into sale and lease-back arrangements on its behalf. City First contends Loveless exceeded the scope of any authority he had to act for City First because he executed the purchase and lease-back arrangement for his own benefit without authority from City First. But express authorization is not required for a finding of agency; an employer is liable if the act complained of was incidental to acts expressly or impliedly authorized. Carmin v. Port of Seattle, 10 Wn.2d 139, 153, 116 P.2d 338 (1941). Where the servant combines his own business with that of the master, the master will be held responsible unless it clearly appears that the servant could not have been directly or indirectly serving his master. Carmin, 10 Wn.2d at 154. There was sufficient evidence to support a finding that Loveless acted not only for his own benefit but also within the scope of his authority to act for City First in all of his transactions involving Collings, both the sale and lease-back arrangement and the Loveless Loan.

## CITY FIRST
### ISSUE THREE: Attorney Fees Awarded at Trial

Collings moved for an award of attorney fees against City First as the prevailing party under the Consumer Protection Act, chapter 19.86 RCW, and the Credit Services Organizations Act, chapter 19.134 RCW. The motion allocated the time spent preparing for and trying claims against City First to the exclusion of time spent against U.S. Bank. Collings asked that the award be enhanced by a factor of 1.2. The trial court granted the request, awarding a total of $628,564.20 in attorney fees and $42,307.41 in costs. City First contends this

17

award included time for wasteful hours, that the allocation of time was unreasonable, that the multiplier should not have been applied, and that the award was excessive.

We review an attorney fees award for abuse of discretion. Ethridge v. Hwang, 105 Wn. App. 447, 460, 20 P.3d 958 (2001). In calculating fee awards, courts should be guided by the lodestar methodology. Mahler v. Szucs, 135 Wn.2d 398, 433, 957 P.2d 632, 966 P.2d 305 (1998). Under the lodestar methodology, a court must first determine that counsel expended a reasonable number of hours in securing a successful recovery for the client. Mahler, 135 Wn.2d at 434. The trial court should exclude wasteful or duplicative hours and any hours pertaining to unsuccessful theories or claims. Mahler, 135 Wn.2d at 434. The lodestar fee, calculated by multiplying the reasonable hourly rate by the reasonable number of hours incurred in obtaining the successful result, may be adjusted upward or downward in the trial court's discretion. Mahler, 135 Wn.2d at 434.

City First contends the court should have excluded, as wasteful, $81,181 in fees for work related to the posttrial arguments on the issue of the Mullen-Collings settlement. City First asserts that the plaintiffs repeatedly shifted their arguments on this issue below and that this led to fees incurred for substantial briefing that City First should not have to pay for. City First is right that the arguments shifted, but the arguments made by Collings were mostly made in response to issues raised by City First. And the arguments made by Collings on

the settlement issue were not unreasonable. We conclude it was not an abuse of discretion to include this time.

Collings proposed an allocation separating time spent on claims with City First from time spent on claims related to U.S. Bank. City First asserts that many more of the time entries were plainly attributable to the Collingses' defense against U.S. Bank. City First relies on Seattle-First National Bank v. Washington Insurance Guaranty Ass'n, 94 Wn. App. 744, 972 P.2d 1282 (1999). There, counsel presented nothing but a blanket statement that 21 hours should be allocated to one party and 245 hours to another. Seattle-First, 94 Wn. App. at 763. Here, the trial court had more to work with. And when the award is viewed in total, we cannot say it was unreasonable to attribute so many hours to City First. But for City First's wrongful conduct, Collings would not have been involved in the litigation with U.S. Bank.

The trial court found a multiplier of 1.2 was appropriate because of the risk: plaintiffs' counsel carried the entirety of fees and costs. Adjustments to the lodestar can be made for the contingent nature of success. See Tribble v. Allstate Prop. & Cas. Ins. Co., 134 Wn. App. 163, 172, 139 P.3d 373 (2006). The contingent nature of success includes the degree to which the prevailing party risked receiving either no recovery at all or a monetary judgment insufficient to adequately compensate its counsel for all work performed. Tribble, 134 Wn. App. at 172. The argument attacking the enhancement fails to address the contingent nature of success. Here, given the risk assumed by counsel in taking the

19

Collings case, the trial court's application of a multiplier rests on tenable grounds. Tribble, 134 Wn. App. at 172.

Finally, City First complains the attorney fee award of over $600,000 is excessive when compared to the plaintiffs' recovery of about $120,000. While the amount of recovery is a relevant consideration in determining the reasonableness of the fee award, it is not a conclusive factor. Mahler, 135 Wn.2d at 433. A large attorney fee award in civil litigation will not be overturned merely because the amount at stake in the case is small. Mahler, 135 Wn.2d at 433. The court properly applied the lodestar methodology. We conclude the award was not excessive.

## CITY FIRST
## ISSUE FOUR:  Credit Services Organizations Act

City First contends that the Collings' claim that City First violated the Credit Services Organizations Act, chapter 19.134 RCW, fails as a matter of law. City First argues that it was excluded from the Act's coverage under RCW 19.134.010(2)(b)(i) because it was subject to regulation by Washington State, having been licensed as a consumer loan company by the Washington State Department of Financial Institutions. City First first raised the argument below in its trial brief and in a motion for judgment as a matter of law that was presented to the trial court after the court heard exceptions to the instructions.

Collings' brief of respondent in response to City First argues that the Act does permit a violation to be found in the circumstances of this case, where the City First branches from which Loveless and Mullen operated in Utah were not licensed by Washington's Department of Financial Institutions.

20

Instruction 19 sets forth the requirement that "each branch" had to be licensed in order to be exempt under the Act. City First did not take exception to instruction 19. Moreover, as Collings argues, the Department's regulations support the "each branch" interpretation of the statute provided by instruction 19. We conclude the trial court did not err in denying City First's motions for judgment as a matter of law as to the issue of coverage under the Credit Services Organizations Act.

## U.S. BANK

We now address U.S. Bank's appeal of the judgment quieting title in the Collingses as against U.S. Bank. In the equitable proceeding instituted by U.S. Bank's claim in intervention, U.S. Bank claimed that it owned the December 2006 Loveless Loan (both the promissory note and the deed of trust securing it). U.S. Bank sought to preserve the deed of trust as a security interest superior to Collings' constructive trust and title.[9]

Collings asserted several theories challenging U.S. Bank's claim that it had the right to enforce the note and deed of trust. The trial court entered findings of fact and conclusions of law rejecting U.S. Bank's claims and accepting

---

[9] Findings of Fact and Conclusions of Law on Equitable Claims, Clerk's Papers at 2150-57, Finding of Fact 6.

A deed of trust is a form of three-party mortgage involving not only a lender and a borrower, but also a neutral third party called a trustee. 18 WILLIAM B. STOEBUCK & JOHN W. WEAVER, WASHINGTON PRACTICE: REAL ESTATE: TRANSACTIONS § 20.1, at 403 (2d ed. 2004). "A borrower or obligor incurs a debt or other obligation to a 'beneficiary' and, as security for that obligation, the 'grantor' conveys an estate in land to a third-party 'trustee.' " 18 STOEBUCK & WEAVER, § 20.1, at 403. The trustee holds an interest in the title of the grantor's property on behalf of the lender, otherwise known as the beneficiary.

the plaintiffs' theories. U.S. Bank assigns error to most of these findings and conclusions.

Findings of fact are reviewed under the substantial evidence standard, defined as a quantum of evidence sufficient to persuade a rational, fair-minded person the premise is true. Sunnyside Valley Irrigation Dist. v. Dickie, 149 Wn.2d 873, 879, 73 P.3d 369 (2003). If the standard is satisfied, a reviewing court will not substitute its judgment for that of the trial court even though it may have resolved a factual dispute differently. Sunnyside, 149 Wn.2d at 879-80. Questions of law and conclusions of law are reviewed de novo. Sunnyside, 149 Wn.2d at 880.

## U.S. BANK
## ISSUE ONE:  Standing

As a preliminary matter, U.S. Bank contends the Collingses lack standing to challenge the validity and enforceability of the Loveless Loan because they were not the makers of the promissory note. Loveless was the maker of the note. U.S. Bank argues that only Loveless and those to whom he was obligated were entitled to argue that the transfer of the note to U.S. Bank did not create an enforceable interest.

The cases cited by U.S. Bank concerning a debtor's lack of standing to challenge an assignment are unhelpful. This was a proceeding in equity. "Equity controls the determination of the claims and defenses alleged in this lawsuit

relating to U.S. Bank's Complaint for Declaratory Relief regarding foreclosure of the Loveless note and deed of trust."[10]

"Standing to assert a claim in equity resides in the party entitled to equitable relief; it is not dependent on the legal relationship of those parties." Smith v. Monson, 157 Wn. App. 443, 445, 236 P.3d 991 (2010). A party with an equitable interest has standing to defend that interest against a party who claims to have a superior interest. See Monson, 157 Wn. App. at 448-49.

Previously, the trial court had quieted title to the property from Loveless back into Collings, finding the existence of a constructive trust. Because Collings had an interest in the property stemming from the constructive trust gained through equity, they had standing in equity to assert their interest against the allegedly superior interest held by U.S. Bank.

## U.S. BANK
### ISSUE TWO: Bona Fide Purchaser or Encumbrancer

Among the reasons why the trial court rejected U.S. Bank's claim to have a security interest superior to Collings was the court's conclusion that U.S. Bank was not a bona fide purchaser or encumbrancer of the Loveless Loan.[11]

A bona fide purchaser is "one who purchases property without actual or constructive knowledge of another's claim of right to, or equity in, the property, and who pays valuable consideration." Albice v. Premier Mortg. Servs. of Wash., Inc., 174 Wn.2d 560, 573, 276 P.3d 1277 (2012). If the purchaser has knowledge or information that would cause an ordinarily prudent person to

---

[10] Clerk's Papers at 2155, Conclusion of Law 21, unchallenged.
[11] Clerk's Papers at 2155, Conclusion of Law 24.

inquire further, and if such inquiry, reasonably diligently pursued, would lead to discovery of title defects or of equitable rights of others regarding the property, then the purchaser has constructive knowledge of everything the inquiry would have revealed. Albice, 276 P.3d at 1284. In considering whether a person is a bona fide purchaser, we ask whether the surrounding events created a duty of inquiry and, if so, whether the purchaser satisfied that duty. Albice, 276 P.3d at 1284. In this determination, the purchaser's knowledge and experience with real estate is to be considered. Albice, 276 P.3d at 1284.

At trial, U.S. Bank was in possession of the original note, endorsed in blank. U.S. Bank presented the testimony of two witnesses and introduced many documents to trace the journey of the Loveless Loan after it left City First and became securitized.[12] The witnesses were David Duclos, Vice President of U.S. Bank and a trust manager, and Christopher DiCicco, an employee of GMAC, the company that became the servicer of the Loveless Loan in February 2007.

According to the testimony, the note was created in December 2006 when Loveless refinanced his loan with City First. City First endorsed the note specially to Greenpoint Mortgage Funding Inc. Greenpoint endorsed the note in blank. The note was acquired by Lehman Brothers Holdings. Lehman conveyed it through a depositor, the Structured Assets Securities Corporation, to U.S. Bank for the benefit of certificate holders.[13] U.S. Bank was to act as trustee for the

---

[12] Securitization of mortgages "refers to the process of issuing mortgage-backed or mortgage-related securities based on the value of bundled mortgage loans." Clerk's Papers at 842, Instruction 2.

[13] Exhibit 155.

Greenpoint Mortgage Funding Trust. U.S. Bank issued certificates to the depositor. The depositor sold the certificates.

Duclos signed the trust agreement on behalf of U.S. Bank.[14] He testified that the Loveless Loan was part of a pool of mortgage loans transferred to the trust on February 1, 2007, the closing date of the trust. He testified that U.S. Bank as custodian had personnel who reviewed the loans and noted any deficiencies, such as the absence of an endorsement on a note. They produced a certificate listing all the loans transferred to the trust along with an exception report listing the loans found to have deficiencies.[15] The Loveless Loan is not among those listed in the exception report.

U.S. Bank claims the evidence shows without any doubt that the Loveless Loan was transferred to it for value in February 2007 and without notice of any claims by the Collingses existing at that time. In February 2007, Collings had not yet filed the lis pendens. The Collingses were still unaware that Loveless had refinanced the home and taken out a home equity line of credit. U.S. Bank contends that when it accepted ownership of the Loveless Loan, it could not have known of any misrepresentations by Loveless since at the time, the Collingses themselves had no idea they had been defrauded.

Militating against U.S. Bank's position are several key findings entered by the trial court concerning the lease by which Loveless rented the Collings home to them with a promise to sell it back to them after three years. The court found that the lease "contained an express restriction prohibiting Loveless from further

---

[14] Exhibit 156.
[15] Exhibit 163.

25

encumbering the home with debt or obtaining a home equity line of credit."[16] The

court determined that U.S. Bank should have discovered the restriction in the

lease through reasonable inquiry and that the lease was a defect that should

have prevented U.S. Bank from accepting ownership of the Loveless Loan.

3. In December of 2006, Loveless violated the prohibition against further encumbering the Property by borrowing $472,500 from defendant City First. This included a refinance loan in the amount of $420,00 (the "Loveless Loan") and a HELOC in the amount of $52,500. . . .

. . . .

13. U.S. Bank was required by both the Custodial Agreement [Trial Exhibit 164 at Bates 647-648] and Trust Agreement § 201(b) [Trial Exhibit 156 at Bates 893-896] to maintain a mortgage origination loan file for each of the mortgage loans in the Greenpoint Trust (Series 2007-1). GMAC maintains scanned copies of the loan files. U.S. Bank therefore had the opportunity to fully review the files before accepting ownership of the Loveless Loan. Such a review would have disclosed the HELOC prohibition which City First (Ms. Russett) testified would have stopped the loan as not being an "arms length transaction."

14. There is insufficient evidence in the record that U.S. Bank did in fact engage in a reasonable inquiry into the Loveless Loan to determine if there were any defects existing regarding the underwriting. U.S. Bank had a duty to inquire as early as February 2007, which would have put U.S. Bank on inquiry notice of the defects in the Loveless Loan. . . .

15. It was unreasonable for U.S Bank to rely exclusively on the representations and warranties about the mortgage loans given by Structured Asset Securities Corporation ("SASC") in the Trust Agreement [Trial Exhibit 156 at § 2.03] and the Mortgage Loan Sale and Assignment Agreement between SASC and Lehman Brothers [Trial Exhibit 155 at § 1.04], given the absence of sufficient time for the warrantors to evaluate the commercial paper being deposited into the Trust. The alleged transfers of the Note and deed of trust from SASC and Lehman Brothers and then from Lehman Brothers to the Trust each occurred on the same day.[17]

U.S. Bank first attacks the finding that there was an executed lease

containing a prohibition against further encumbrances.

---

[16] Clerk's Papers at 2151, Finding of Fact 2.
[17] Clerk's Papers at 2151, 2153-54.

Collings produced copies of two proposed leases sent to him by Loveless through e-mail.[18] In one of the e-mail messages, Loveless refers to the Collingses as having signed all the paperwork.[19] The copies retained by the Collingses contained the prohibition testified to by the Collingses.

U.S. Bank complains that Collings did not produce a copy of the executed lease. But Collings' inability to produce a copy of the executed lease does not render his proof insufficient. City First did not produce the origination file when requested by the Collingses. Russett, the compliance officer employed by City First, testified that files might have been destroyed in December 2009 consistent with document retention policies. And in answering a request for production of the mortgage loan origination file, U.S. Bank responded that it had no records.[20] The evidence was sufficient to prove the copy presented by Collings accurately reflected an executed lease.

U.S. Bank next contends that if there was an executed lease, Collings failed to prove U.S. Bank had notice of its existence.

By contractual agreement, U.S. Bank was required to maintain a loan origination file for each of the loans in the trust. The contents of the loan origination file were not introduced into evidence by any party. Collings argued that the lease must have been in the file because without proof of Loveless' anticipated investment income, City First would not have loaned money to him. Supporting this argument was Mullen's testimony that Loveless would have had

---

[18] Exhibit 3 & 5.

[19] Exhibit 5.

[20] Exhibit 81 at 6, Request for Production No. 29; see also Report of Proceeding (Jan. 20, 2011) at 47, where Collings argues the significance of U.S. Bank's failure to produce the loan origination file.

to provide a copy of the rental agreement to City First and the underwriter, and that it would have to be in the "file."[21] Russett similarly testified that the lease would have been provided to City First when Loveless took out the loan because the property was an investment property as opposed to a second home.[22]

U.S. Bank agrees that the lease should have been in the file supporting the original purchase loan that Loveless took out in June 2006, but says there was no reason for a copy of the lease to be in the loan origination file for the Loveless Loan of December 2006 "as it was a refinance of Loveless's own loan."[23] U.S. Bank does not point to evidence or authority supporting the proposition that evidence of income is a reasonable concern when financing a loan on an investment property, but not for refinancing it. We find this line of argument unpersuasive.

U.S. Bank also contends that the trial court overlooked the testimony of Duclos concerning the due diligence review by its employees to make sure the loans being acquired were enforceable. But Duclos, who testified about the review process, was not personally involved in it and his testimony did not establish that the review process was infallible. To the contrary, the evidence supports a finding that the lease was in the file where a reasonable inquiry would have found it. In short, the evidence was sufficient to support a finding that U.S. Bank had constructive notice of the executed lease.

Was notice of the lease enough to prevent U.S. Bank from acquiring an interest in the Collings property as a bona fide purchaser or encumbrancer? U.S.

---

[21] Clerk's Papers at 768.

[22] Report of Proceedings (Sept. 15, 2010) at 193.

[23] Brief of Appellant U.S. Bank at 41.

Bank does not directly argue it was not. But U.S. Bank does challenge the finding that the Loveless Loan was not an arm's length transaction, mentioned in finding of fact 13. Russett testified that knowledge of the provision barring Loveless from taking out a home equity line of credit on the Collings residence "would have stopped the loan" as not being an "arm's length transaction."[24] Russett's testimony explaining what she meant by "arms length transaction" was in the context of a discussion about City First's original loan to Loveless in June 2006, not to the refinance in December 2006.[25] Thus, U.S. Bank is correct in pointing out that her reference to "arms length transaction" was not strictly related to the transaction that we have been referring to as the Loveless Loan. Nevertheless, the trial court's general point was that the lease prohibition against a home equity line of credit (HELOC) should have raised red flags. Russett's testimony does support that point:

> Q. [Collings' attorney] . . . If someone is coming to you to ask you to underwrite a loan on an investment property on a rental and you read a rental agreement that says no HELOCs and the guy who's making the application to you wants a HELOC, is that going to matter to you?
>
> A. Personally?
>
> Q. From your experience.
>
> A. From my experience. Yes.
>
> Q. And in what way would that matter to you?
>
> A. I would have to -- I would question why they were doing something they weren't supposed to be doing.

---

[24] Clerk's Papers at 2153, Finding of Fact 13.
[25] Report of Proceedings (Sept. 16, 2010) at 14-15.

Q. It's not something that you would simply ignore if you saw it, is it?

A. If I saw it?

Q. Yes.

A. No.

Q. Is that consistent with your view of what a competent mortgage underwriter would do?

A. Yes.[26]

We conclude substantial evidence supports the findings that a reasonable inquiry by U.S. Bank should have discovered the lease in the loan origination file and that U.S. Bank should have recognized it as a red flag indicating the possibility of possession of the home by someone with a superior claim. In February 2007, the time when U.S. Bank acquired the Loveless Loan, the constructive trust generated by the equity skimming activities of Loveless had given the Collingses an equitable interest in their home that was prior in time and visible to a reasonable inquiry by U.S. Bank. Accordingly, we affirm the trial court's conclusion that U.S. Bank is not a bona fide purchaser or encumbrancer.

Collings argues that the judgment quieting his title as against U.S. Bank can be affirmed on alternative grounds. He contends that City First's transfer of the deed of trust to MERS (Mortgage Electronic Registration Systems Inc.) separated the deed of trust from the note, rendering the deed of trust unenforceable, and that U.S. Bank failed to establish its right to enforce the note under various provisions of the law of negotiable instruments. We do not

---

[26] Report of Proceedings (Sept. 15, 2010) at 78.

address these arguments, as the conclusion that U.S. Bank was not a bona fide purchaser of the Loveless Loan is sufficient to support the judgment quieting title in the Collingses as against U.S. Bank.

## ATTORNEY FEES ON APPEAL

Collings asks for attorney fees on appeal against both City First and U.S. Bank. We grant the request against City First under the same statutory provisions that authorized the award in the trial court. As to U.S. Bank, the deed of trust provides for an award of prevailing party attorney fees and costs "in any action or proceeding to construe or enforce any term of this Security Instrument."[27] Because U.S. Bank intervened to enforce the deed of trust, we conclude the provision in the deed of trust is applicable and Collings, as the prevailing party, is entitled to an award of attorney fees on appeal against U.S. Bank.

Affirmed.

Becker, J.

WE CONCUR:

_____

---

[27] Exhibit 12.

31

SCHINDLER, J. (dissenting) — I respectfully disagree with the conclusion that the secret agreement between the plaintiffs and one of the codefendants to enter into a covenant not to execute and release did not result in prejudice to defendant City First that warrants a new trial. The undisclosed agreement distorted the interests and alignment of the parties and created a sham of adversity that is contrary to Washington law, the right to a fair trial, the integrity of the adversary system, candor to the tribunal, and the administration of justice. Consistent with the requirements of the Tort Reform Act of 1986, chapter 4.22 RCW, the Supreme Court should adopt a rule requiring the timely disclosure of an agreement between a plaintiff and a codefendant to enter into a covenant not to sue and release.

In multi-defendant litigation, an undisclosed settlement agreement between a plaintiff and one or more of the codefendants that limits liability yet retains the settling codefendant as a party can take various forms. However, the critical characteristic of these agreements is secrecy.

> Secrecy is the essence of such an arrangement, because the court or jury as trier of the facts, if apprised of this, would likely weigh differently the testimony and conduct of the signing defendant as related to the non-signing defendants. . . .
> The search for the truth, in order to give justice to the litigants, is the primary duty of the courts. Secret agreements between plaintiffs and one or more of several multiple defendants can tend to mislead judges and juries, and border on collusion.

Ward v. Ochoa, 284 So. 2d 385, 387 (Fla. 1973).

The integrity of our system of justice is undermined by a secret settlement agreement between the plaintiffs and a codefendant. Our adversary system of justice is based on the fundamental assumption that each party is motivated by their obvious interest in the litigation. That assumption is no longer valid where a plaintiff and a

32

codefendant enter into a secret covenant not to sue and release. The alignment of the parties is not what it appears to be. The codefendant remains in the case as a defendant. The other parties to the litigation are misled, and the jury is deceived by being informed that they are resolving an existing dispute between parties that have already resolved those claims.

In Washington, a pretrial settlement agreement between the plaintiff and a codefendant in litigation involving multiple defendants is subject to RCW 4.22.060. Under RCW 4.22.060 and RCW 4.22.070, a plaintiff can keep the settling defendant in the litigation by entering into "a release, covenant not to sue, covenant not to enforce judgment, or similar agreement." RCW 4.22.060(1). Because of the impact of such an agreement on the allocation of liability and the risk of collusion and fraud, the statute requires timely disclosure and a reasonableness hearing. RCW 4.22.060(1);[1] Besel v. Viking Ins. Co., 146 Wn.2d 730, 738-39, 49 P.3d 887 (2002).

In recognition of the prejudicial effect of an undisclosed settlement agreement with one or more codefendants in a multi-defendant case, the overwhelming majority of jurisdictions require timely disclosure of the existence and terms of an agreement between the plaintiff and a codefendant to the other parties in the case and the court. See Alaska — Breitkreutz v. Baker, 514 P.2d 17 (Alaska 1973); Arizona — Taylor v. DiRico, 124 Ariz. 513, 606 P.2d 3 (1980); Arkansas — Firestone Tire & Rubber Co. v.

---

[1] RCW 4.22.060(1) provides, in pertinent part:
A hearing shall be held on the issue of the reasonableness of the amount to be paid with all parties afforded an opportunity to present evidence. A determination by the court that the amount to be paid is reasonable must be secured. If an agreement was entered into prior to the filing of the action, a hearing on the issue of the reasonableness of the amount paid at the time it was entered into may be held at any time prior to final judgment upon motion of a party.
     The burden of proof regarding the reasonableness of the settlement offer shall be on the party requesting the settlement.

Little, 276 Ark. 511, 639 S.W.2d 726 (1982); California — Pellett v. Sonotone Corp., 26 Cal. 2d 705, 160 P.2d 783 (1945); Colorado — Bashor v. Northland Ins. Co., 29 Colo. App. 81, 480 P.2d 864 (1970), aff'd 177 Colo. 463, 494 P.2d 1292 (1972); Florida — Ward, 284 So. 2d at 385; Idaho — Soria v. Sierra Pac. Airlines, Inc., 111 Idaho 594, 726 P.2d 706 (1986); Illinois — Reese v. Chicago, Burlington & Quincy R.R. Co., 55 III. 2d 356, 303 N.E.2d 382 (1973); Indiana — Fullenkamp v. Newcomer, 508 N.E.2d 37 (Ind. Ct. App. 1987); Kansas — Ratterree v. Bartlett, 238 Kan. 11, 707 P.2d 1063 (1985); Louisiana — Daniel v. Penrod Drilling Co., 393 F. Supp. 1056, (D.C. La. 1975); Maryland — Gen. Motors Corp. v. Lahocki, 286 Md. 714, 410 A.2d 1039 (1980); Minnesota — Johnson v. Moberg, 334 N.W.2d 411 (Minn. 1983); Nebraska — Hegarty v. Campbell Soup Co., 214 Neb. 716, 335 N.W.2d 758 (1983); New Hampshire — Bedford Sch. Dist. v. Caron Const. Co., 116 N.H. 800, 367 A.2d 1051 (1976); Ohio — Hodesh v. Korelitz, 123 Ohio St. 3d 72, 2009-Ohio-4220, 914 N.E.2d 186; Oregon — Grillo v. Burke's Paint Co., Inc., 275 Or. 421, 551 P.2d 449 (1976).[2]

Here, there is no dispute the Collingses and Mullen entered into the covenant not to execute and release before Mullen's deposition and did not disclose the existence and terms of the agreement to City First or the court until well after trial.

---

[2] A significant number of commentators have criticized undisclosed partial settlement agreements. See, e.g., Robin Renee Green, Comment, Mary Carter Agreements: The Unsolved Evidentiary Problems in Texas, 40 Baylor L. Rev. 449 (1988); John E. Benedict, Note, It's a Mistake to Tolerate the Mary Carter Agreement, 87 Colum. L. Rev. 368 (1987); Richard Casner, Note, Admission into Evidence of a Mary Carter Agreement from a Prior Trial is Harmful Error, 18 Tex. Tech. L. Rev. 997 (1987); June F. Entman, Mary Carter Agreements: An Assessment of Attempted Solutions, 38 U. Fla. L. Rev. 521 (1986); Katherine Gay, Note, Mary Carter in Arkansas: Settlements, Secret Agreements, and Some Serious Problems, 36 Ark. L. Rev. 570 (1983); David R. Miller, Comment, Mary Carter Agreements: Unfair and Unnecessary, 32 Sw. L.J. 779 (1978); Meriwether D. Williams, Comment, Blending Mary Carter's Colors: A Tainted Covenant, 12 Gonz. L. Rev. 266 (1977); John Edward Herndon, Jr., Note, "Mary Carter" Limitation on Liability Agreements Between Adversary Parties: A Painted Lady Is Exposed, 28 U. Miami L. Rev. 988 (1974); and David Jonathan Grant, Note, The Mary Carter Agreement—Solving the Problems of Collusive Settlements in Joint Tort Actions, 47 S. Cal. L. Rev. 1393 (1974).

The Collingses sued Robert and Rebecca Loveless, Andrew Mullen and his spouse, Gavin and Margaret Spencer, Home Front Holdings LLC, and City First Mortgage Services LLC. The Collingses alleged that Loveless and Mullen owned Home Front, and Loveless agreed to purchase their house and lease it back to them. The Collingses claimed Loveless and Mullen were either employees or authorized agents of City First, and that Loveless and Mullen violated the Equity Skimming Act, chapter 61.34 RCW, and other consumer protection statutes.[3] The Collingses sought damages and entry of a decree quieting title in the property. The trial was scheduled to begin on September 13, 2010.

On June 3, 2009, the court entered an order of default against Loveless. On March 31, 2010, the court entered an amended default judgment quieting title in the property to the Collingses.

On June 9, 2010, the Collingses filed a notice to Mullen to attend the jury trial on September 13 and testify. On June 20, the Collingses noted the deposition of Mullen for July 26. In the days leading up to the July 26 deposition, the Collingses negotiated a covenant not to execute with Mullen and his attorney. The covenant not to execute between the Collingses and Mullen provides, in pertinent part:

> WHEREAS, plaintiffs brought claims against defendants Mullen in a legal action commenced in the Superior Court of Washington for King County entitled <u>Collings v. City First Mortgage Services, LLC, et al.</u>, King County Cause No. 09-2-13062-1 (SEA) as a result of an alleged rescue foreclosure scam and subsequent foreclosure proceedings perpetrated against plaintiffs; and
>
> . . . .
> WHEREAS, this agreement is being made for the sole benefit of the plaintiffs and defendants Mullen, under the policy of the law favoring the settlement of litigation, which policy would be to some extent impaired

---

[3] The Credit Services Organization Act, chapter 19.134 RCW; the Consumer Loan Act, chapter 31.04 RCW; and the Consumer Protection Act, chapter 19.86 RCW.

if any remaining defendants in <u>Collings v. City First Mortgage Services, LLC, et al.</u>, King County Cause No. 09-2-13062-1 (SEA) or any other remaining potentially liable persons or entities, are to be in any way construed as third party beneficiaries thereof; and

WHEREAS, defendants Mullen expressly deny any liability for the alleged rescue foreclosure scam and subsequent foreclosure proceedings perpetrated against plaintiffs; and

WHEREAS, plaintiffs expressly reserve all rights of actions, claims, demands, and rights of execution against any and all other persons or entities, including but not limited to all defendants and intervening parties named in <u>Collings v. City First Mortgage Services, LLC, et al.</u>, King County Cause No. 09-2-13062-1 (SEA) (<u>e.g.</u>, City First Mortgage Services, LLC, etc.), other than defendants Mullen:

1.     In consideration of the promise to pay $500.00 to plaintiffs, plaintiffs do covenant, and agree with defendants Mullen, that plaintiffs (or any successor or assignee) will not execute or otherwise seek to enforce or collect on any judgment entered in the pending lawsuit against defendants Mullen. Plaintiffs will not assign any such judgment to any other party and, if such assignment is made, plaintiffs' assignors will be bound by the terms of this Covenant Not to Execute. Should judgment be entered against any defendant who is a party to this agreement, plaintiff will provide that defendant with a Satisfaction of Judgment promptly upon final disposition of all claims in this matter.

Neither the Collingses nor Mullen disclosed the existence or terms of the agreement to City First either before the deposition or during the trial. The Collingses' attorney deposed Mullen on July 26. The City First attorney was present at the deposition, but asked no questions.

Loveless filed for bankruptcy before the jury trial began on September 13. Despite the notice to attend trial, Mullen did not appear at trial. The Collingses presented and read a portion of the transcript from Mullen's deposition testimony to the jury. City First read other portions of the deposition to the jury.

The jury instructions directed the jury to decide whether Loveless and Mullen engaged in acts that violated the Equity Skimming Act, the Credit Services Organization Act, the Consumer Loan Act, and the Consumer Protection Act, and whether City First

was vicariously liable for their acts. In answer to the special verdict form, the jury found Loveless and Mullen were liable to the Collingses, and that City First was responsible for their acts. The jury awarded the Collingses damages. The jury also awarded punitive damages against Loveless, Mullen, and City First under the Credit Services Organization Act.

Two months after trial, City First discovered that the Collingses had entered into a covenant not to execute with Mullen before his deposition on July 26. Included in the 33 pages of billing records that the Collingses submitted in support of their request for an award of attorney fees are entries showing that the Collingses were negotiating a covenant not to execute and release agreement with Mullen beginning on July 23. City First filed a motion for a new trial.

City First argued that the failure to disclose the covenant not to execute prejudiced City First by compromising Mullen's deposition testimony, depriving City First of a full opportunity to examine Mullen, and giving "the jury the false impression that the Mullens were still parties to the action."

Mullen submitted a declaration stating that he received the final version of the covenant not to execute right before his deposition, and the Collingses would only agree to enter into the covenant not to execute if his deposition testimony was "acceptable." Mullen testified, in pertinent part:

> In the days leading up to the deposition, Plaintiffs' counsel and my counsel negotiated a covenant not to execute any judgment against my wife and me in anticipation of that deposition. I received the final version of that document from Plaintiffs' counsel on July 26, 2010 - the morning of my deposition - and was informed that Plaintiffs would only execute the covenant if my deposition testimony was acceptable. The covenant was fully executed after my deposition.

37

City First also pointed out that many of the jury instructions flatly contradicted the covenant not to execute and were misleading. For example, Jury Instruction No. 9 states:

> The Collings allege that defendants Robert Paul Loveless, Andrew Mullen, and Gavin Spencer were employees of defendant City First Mortgage Services, LLC and that at all times defendants Loveless and Mullen and Gavin Spencer were acting within the scope of employment during the course of their dealings with the Collings.
>
> If you find that Robert Paul Loveless, Gavin Spencer, and Andrew Mullen, or any of them were acting within the scope of their employment with City First Mortgage Services, LLC during the course of their dealings with the Collings, and if you find that Loveless, Mullen or the both of them are liable, then you must find that the particular defendant and City First Mortgage Services, LLC are both liable.

City First also cited Jury Instruction No. 23 and No. 24. Those jury instructions state, pertinent part:

> The Collings claim that defendants Robert P. Loveless, Andrew Mullen, and City First engaged in violations of the Consumer Protection Act by violating the Equity Skimming Act, the Credit Services Organization Act, and the Consumer Loan Act.
>
> . . . .
>
> The Collings claim that defendants Robert P. Loveless, Andrew Mullen, and City First Mortgage Services, LLC have each violated the Washington Consumer Protection Act. To prove a violation of the Washington Consumer Protection Act as to each of these defendants, the Collings have the burden of proving each of the following propositions.

The trial court denied the motion for a new trial. The order summarily states that "City First has not identified any preserved error in instructing the jury or in evidentiary or procedural rulings that affect the substantial rights of the parties."

In affirming the trial court's denial of the motion for a new trial and concluding that City First does not show prejudice, the majority also ignores the incentive of Mullen to cast City First in an unfavorable light, the inability of City First to cross-examine Mullen, and the right of the jury to know about his alignment with the plaintiffs.

38

The cases the majority cites for the proposition that other courts require a "concrete" showing of prejudice in considering the effect of an undisclosed settlement agreement between plaintiffs and a codefendant are distinguishable.

In Medical Staffing, because the plaintiffs and the defendant "freely disclosed [the] alignment of their interests to the jury during opening statements," and that alignment did not change, the court concluded it was unlikely the jury would have reached a different verdict. Med. Staffing Network, Inc. v. Connors, 313 Ga. App. 645, 649, 722 S.E.2d 370 (2012).

In Monti, the court held nondisclosure of the settlement was not prejudicial because "the agreement did not change the adversarial alignment of the parties." Monti v. Wenkert, 287 Conn. 101, 127, 947 A.2d 261 (2008). The court emphasized that "[s]ignificantly, the agreement was executed after the plaintiffs rested their case," and after the codefendant "testified in her own defense, maintaining her strategy of attempting to shift liability" to the other codefendant. Monti, 287 Conn. at 127. Here, unlike in Medical Staffing and Monti, there is no question in this case that the undisclosed covenant not to execute changed the adversarial alignment of the parties, depriving City First of the right to a fair trial.

The majority also concludes that there is "nothing to suggest that [Mullen's] answers were crafted to aid the Collingses against City First. His testimony was largely consistent with the testimony of Sherri Russett, a City First employee since December 2009 who testified about how City First operated."

I think it is difficult, if not impossible, to determine whether Mullen's testimony would have been different absent the secret agreement. And even if we could make

39

this determination, it does not change the fact that the undisclosed covenant not to execute distorted the true position of the parties and resulted in misleading City First and the jury.

Nonetheless, City First points to a number of instances where, consistent with the secret covenant not to execute and release, Mullen gave unfavorable testimony to City First.

> That City First supervised Mullen's and Loveless's work . . . .
> That all of Home Front Services' loans were placed with City First . . . .
> Based entirely on "speculation," that City First profited from Home Front Services' loans . . . .
> Referring specifically the initial loan relating to the Collingses' residence, that there was a significant documentation error . . . .
> Based on what Mullen "would imagine," that City First should have identified the above error.

City First also points to a number of instances where Mullen omitted certain critical facts. For example,

> That Home Front Services operated as an independent branch of City First . . . and that City First was not involved in preparing loan documents originating out of Mullen's and Loveless's Home Front Services office. . . .
> That there was and is no common ownership or management or employment or agency agreement between City First and Home Front Holdings, LLC or Integrity Management Group. . . .
> That there was no yield spread premium on the loans relating to the Collingses' residence . . . , that all of the fees charged for those loans were "average" fees . . . , and that City First lost money on those loans. . . .
> That City First did not underwrite any loan relating to the Collingses' residence, did not service any such loan, and was not the actual leader for any such loan. . . .
> That the paperwork for the loans relating to the Collingses' residence was prepared in Mullen's and Loveless's Home Front Services office and, upon completion, was sent directly to the respective lender - *not* to City First.

Because the failure to disclose the covenant not to execute and release deprived

City First of the right to a fair trial, I would reverse and remand for a new trial.